1  JEFFREY C. KRAUSE (State Bar No. 94053),
   jkrause@stutman.com
2  CHRISTINE M. PAJAK (State Bar No. 217173), and
   cpajak@stutman.com
3  NEETA MENON (State Bar No. 254736), Members of
   nmenon@stutman.com
4  STUTMAN, TREISTER & GLATT
   PROFESSIONAL CORPORATION
5  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
6  Telephone:  (310) 228-5600
   Facsimile:   (310) 228-5788
7
   Reorganization Counsel for
8  Debtor and Debtor in Possession

9  Debtor's Mailing Address:
   1880 Century Park East, Suite 810
10 Los Angeles, CA  90067

11
                    **UNITED STATES BANKRUPTCY COURT**
12
                    **CENTRAL DISTRICT OF CALIFORNIA**
13
                          **LOS ANGELES DIVISION**
14

15 In re                          )  Case No. 2:10-39113-BR
                                   )
16 LITTLE TOKYO PARTNERS, L.P.,    )  Chapter 11
   a Delaware limited partnership, )
17                                 )  **MOTION FOR ORDER EXTENDING**
              Debtor.              )  **DEBTOR'S AUTHORITY TO USE CASH**
18                                 )  **COLLATERAL AND TO BORROW MONEY ON**
                                   )  **UNSECURED ADMINISTRATIVE PRIORITY**
19                                 )  **BASIS; DECLARATION OF DAVID GODDARD**
                                   )  **IN SUPPORT THEREOF**
20                                 )
                                   )              Hearing
21                                 )
                                   )  Date:      December 17, 2010
22                                 )  Time:      10:00 a.m.
                                   )  Ctrm:      Courtroom 1668
23                                 )              255 E. Temple Street
                                   )              Los Angeles, CA 90012
24                                 )
                                   )
25                                 )
                                   )
26 _____ )

27

28

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR'S SECURED CREDITORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND OTHER PARTIES IN INTEREST:**

Little Tokyo Partners, L.P., the debtor and debtor in possession in the above captioned case (the "Debtor"), hereby moves the Court for the entry of an order (1) extending the Debtor's authority to use cash collateral for a period of an additional eleven (11) weeks, which would extend such authority through March 4, 2011, and (2) authorizing the Debtor to borrow $75,000 on an unsecured, administrative priority basis from its limited partner to fund the payment of a fee to Hilton Worldwide, Inc. ("Hilton"), to process the Debtor's application to a franchise agreement to convert the Hotel (as defined below) to a Doubletree.

The Court has previously granted the Debtor authority to use cash, negotiable instruments, deposit accounts, and other cash equivalents within the scope of section 363(a) of the Bankruptcy Code, whenever acquired, and wherever located, including cash and cash equivalents in escrow, in which the Debtor's estate (the "Estate") and an entities other than the Estate have an interest ("Cash Collateral").  At the beginning of this case, the Debtor sought and obtained Court authority to use Cash Collateral, on a final basis, through December 3, 2010, pursuant to a prior order of this Court. See Docket No. 100.  In order to provide regular notice of the hearing on this Motion, the Debtor entered into a stipulation with its secured lenders and the Creditors' Committee to extend the use of Cash Collateral through December 17, 2010. See Docket No. 144.  The Debtor continues to work with its secured lenders to reach agreement on the continued consensual use of Cash Collateral and, in the event that these negotiations are successful, the parties will file another stipulation with the Court.  In the meantime, the Debtor has filed this Motion to seek authority to continue its use of Cash Collateral pursuant to the budget (the "Budget") attached to the accompanying Declaration of David Goddard (the "Goddard Declaration") as Exhibit "1".

The Debtor has an ongoing need to use the Cash Collateral, and it would be impossible for the Debtor to maintain its operations as a going concern without the benefit of this use.  Thus, discontinuing the Debtor's access to Cash Collateral would invariably lead to a diminution of the value of the Estate. The Budget demonstrates that: (a) the Debtor cannot operate unless it is authorized to use Cash Collateral; (b) the Debtor can operate if it is granted authority to

1    use Cash Collateral; and (c) the value of the assets subject to claimed liens does not decrease during

2    the period set forth in the Budget.  The terms of the proposed use of Cash Collateral are fair and

3    reasonable, and adequately protect those parties known to assert an interest in Cash Collateral.  The

4    Debtor reserves the right to seek to modify the Budget and to seek authority to use Cash Collateral

5    for periods extending beyond the period covered by the Budget.

6          The Debtor does not seek to use Cash Collateral to fund the $75,000 fee payable to

7    Hilton.  The Debtor's limited partner has agreed to advance that fee and seeks only a simple

8    administrative priority claim for the amounts advanced.  This claim would have priority under

9    Bankruptcy Code §§ 364(b) & 503(b)(1).  The Debtor does not seek super-priority status or authority

10    to grant a lien to secure the advance.

11          This Motion is based on the following memorandum of points and authorities, the

12    accompanying Goddard Declaration, the record in this case, and the arguments, evidence, and

13    representations that may be presented at or prior to the hearing on this Motion.

14          **WHEREFORE**, the Debtor respectfully requests that the Court enter an order

15    extending the Debtor's authorized use of Cash Collateral to March 4, 2011.

16

17    DATED:  November 24, 2010

18                         */s/  Neeta Menon*
                        JEFFREY C. KRAUSE,

19                         CHRISTINE M. PAJAK and
                        NEETA MENON, Members of

20                         STUTMAN, TREISTER & GLATT
                        PROFESSIONAL CORPORATION

21                         Reorganization Counsel for Debtor and
                        Debtor in Possession

22

23

24

25

26

27

28

                                                                  3

**MEMORANDUM OF POINTS AND AUTHORITIES**[1]

**I.**

**STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(b)**

By this Motion, the Debtor hereby requests that the Court authorize the use of Cash Collateral under Bankruptcy Code section 363(c)(2)(B) and the unsecured administrative borrowing under Bankruptcy Code section 363(b) .  As required by Bankruptcy Rule 4001(b), set forth below are the material provisions regarding the proposed use of Cash Collateral and borrowing.

**A.**    **Entities With An Interest In Cash Collateral:**[2]

The entities with an interest in Cash Collateral are:

(1)    First-Citizens Bank & Trust Company (the "Bank"), as successor in interest to First Regional Bank.  The Bank is a beneficiary under:

(i)    that certain Promissory Note ("Note 1")[3], dated as of August 10, 2007, in the principal amount of $10,400,000, which it asserts is secured by a first priority lien on Weller Court ("Weller Court"), a mall located in the "Little Tokyo" area of Downtown Los Angeles.  As of the Petition Date, the outstanding principal amount due and owing under Note 1 was $10,400,000.

(ii)    that certain Promissory Note ("Note 2"), dated as of November 25, 2009, in the principal amount of $33,600,000, which it asserts is secured by a first priority lien on the Kyoto Grand Hotel and Gardens (the "Hotel"), also located in Little Tokyo.  As of

---

[1]    Terms not otherwise defined herein shall have the same meanings ascribed to them in the preceding Motion.

[2]    Solely for the purposes of this Motion, the Debtor assumes, without conceding, that the Bank holds allowable claims not subject to subordination, and validly perfected and unavoidable security interests in the assets described in this Motion.  The Debtor reserves all rights and defenses with respect to the Bank's claims, liens, and interests, and nothing contained in this Motion is intended or should be construed as:  (a) an admission by the Debtor as to the nature, extent, amount, validity, perfection, or priority of the claims or liens of the Bank; (b) a waiver by the Bank of any rights, claims (including claims to avoid any such interests), or defenses it has or may have with respect to the claims, liens, and interests of the Bank, whether arising under the Bankruptcy Code or otherwise; or (c) a modification or reallocation of the burdens of proof assigned by Bankruptcy Code section 363(p).

[3]    Note 1 was originally issued in the principal amount of $44,000,000, but was subsequently amended and reduced to $10,400,000, when the Debtor paid off $33.6 million of the Original Loan in August 2009, as discussed in Section II.B.2 below.

the Petition Date, the outstanding principal amount due and owing under Note 2 was
$33,580,415.83.

(2)    Excell Investment Group, LLC ("Excell").  On July 14, 2010, Excell funded a
$300,000 loan to the Debtor, pursuant to a secured loan transaction, in order to fund the
chapter 11 retainer payable to the Debtor's insolvency counsel.  The Excell loan is secured by
a second priority deed of trust on the Hotel and Weller Court, which is subordinate to the
Bank's first priority deed of trust on the Hotel and Weller Court.

**B.    Purpose:**

The Debtor seeks to use Cash Collateral to continue to market, lease, manage and
operate the Hotel and Weller Court (hereinafter, collectively referred to as the "Properties"), in the
ordinary course of business, to ensure that the operations during chapter 11 meet the needs of the
Debtor's guests, customers, employees and lessees of the Properties.

**C.    Duration and Material Terms:**

The Debtor seeks to extend its authority to use Cash Collateral until the end of the
term referenced in the Budget, which is March 4, 2011.  See Budget, Ex. 1 to Goddard Declaration.

**D.    Adequate Protection:**

The Bank's and Excell's lien interests will be adequately protected by:  (1) the
maintenance and preservation of the going concern value of their respective collateral, as described
and discussed in section III-B-1 below; and (2) replacement liens in any proceeds generated from the
postpetition use of the Properties.

**E.    Unsecured Borrowing**

The Debtor also seeks to borrow $75,000 to pay the fee payable to Hilton under the
letter of intent as a condition to Hilton's approval of a proposed franchise agreement for the Hotel.
The Debtor has more than $75,000 in Cash Collateral generated by the Hotel, which could be used to
fund the Hilton fee. The Debtor anticipates that the Bank might object to the use of Cash Collateral
to pay this fee because the Bank would prefer not to proceed with the Hilton franchise, as part of the
Bank's effort to force the Debtor to sell the Hotel.  Rather than litigate with the Bank over the
propriety of using Cash Collateral to pay this fee, the Debtor's limited partner has agreed to advance

5

1  this fee and that its claim will be a simple unsecured administrative priority claim.  It will not be

2  secured by any asset of the estate.  It will not be entitled to "super-priority" ahead of other

3  administrative priority expenses.  It will be due and payable upon confirmation of a plan or

4  conversion of the case to a case under chapter 7.

## II.

## STATEMENT OF FACTS

### A.    Petition Date and Jurisdiction.

On July 15, 2010 (the "Petition Date"), the Debtor commenced this chapter 11 case.

Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtor is continuing to

manage its financial affairs as a debtor in possession.

This Court has jurisdiction over this chapter 11 case and this Motion pursuant to

28 U.S.C. §§ 1334 and 157(b), and venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and

1409.

### B.    General Background of the Debtor.

### 1.    Business Operations and Events Leading Up to the Bankruptcy Filing.

The Debtor owns the Kyoto Grand Hotel and Gardens (the "Hotel") and Weller Court

("Weller Court" and, together with the Hotel, the "Subject Properties") in the "Little Tokyo"[4] area of

Downtown Los Angeles.

Starting in the last quarter of 2008, the Debtor's financial performance was materially

impacted by the continuing deterioration in the overall economy and the resulting decline in the

business and leisure travel market.  The Hotel experienced a precipitous drop in revenue starting in

the last quarter of 2008, which continued throughout 2009.

As a result, in January 2010 the Debtor defaulted under a $33,600,000 loan with

First-Citizens Bank & Trust Company (the "Bank"), as successor to First Regional Bank.  This loan

is secured by a first priority deed of trust on the Hotel.  The Debtor stayed current on the repayment

---

[4]    The Hotel is located at 204 East First Street, and Weller Court is located at 120 South
Los Angeles Street and 227 East Second Street.

1   of an earlier loan with the Bank secured by a first priority deed of Trust on Weller Court, of which

2   the remaining balance is approximately $10,400,000.

3          In the second quarter of 2010, the Bank initiated non-judicial foreclosure proceedings

4   against the Subject Properties, relying on cross-default provisions in the loan agreements.  Prior to

5   the scheduled non-judicial foreclosure sale on July 16, 2010, the Debtor filed its chapter 11 petition

6   on the Petition Date.

7                    **2.        The Debtor's Secured Debt.**

8          Pursuant to that certain Business Loan Agreement dated as of August 10, 2007 (the

9   "Original Loan"), First Regional Bank ("FRB") loaned to the Debtor the original principal sum of

10  $44,000,000.  The Original Loan was secured by a deed of trust on both the Hotel and Weller Court,

11  which were part of a single legal lot at the time.  The Original Loan was partially guaranteed by the

12  equity owners of the Debtor (the "Guaranty").

13         Under the terms of the Guaranty, the obligations thereunder would be released upon

14  the Hotel and Weller Court achieving a debt service coverage ratio of not less than 1.25 to 1.0 for

15  two consecutive quarters.  The Debtor and the guarantors provided financial statements to FRB in

16  August 2008, demonstrating that the Debtor had met this ratio.  FRB conducted four months of

17  analysis of the financial information, including dozens of emails exchanges between the FRB bank

18  officer in charge of the Original Loan and the Debtor's accounting staff.  Ultimately, FRB agreed

19  that this ratio had been met and, in December 2008, FRB formally released all obligations under

20  each of the Guaranties.  As discussed further below, FRB's successor seeks to evade this release and

21  resurrect and transform these Guaranties, but since December 2008 these Guaranties have not been

22  in existence.

23         In August 2009, the Debtor divided the Properties into two legal lots—one for the

24  Hotel and one for Weller Court—and refinanced its loan obligations.  In November 2009, the Debtor

25  entered into a new loan transaction with FRB under which the Debtor borrowed $33,600,000 and

26  granted FRB a deed of trust on the Hotel to secure the new loan (the "Hotel Loan").  The proceeds of

27  the Hotel Loan were paid to FRB in partial satisfaction of the Original Loan, and FRB released the

28  deed of trust on the Hotel which secured the Original Loan.  The remaining balance owing on the

                                                                                                    7

1   Original Loan in the amount of $10,400,000 is, therefore, now secured only by the Weller Court

2   property. This reduced loan shall be referred to herein as the "Remaining Original Loan."  The two

3   loans are not cross-collateralized but they do contain cross-default provisions.

4                On January 29, 2010, FRB was closed by the California Department of Institutions,

5   and the Federal Deposit Insurance Corporation (the "FDIC") was appointed receiver.  The Debtor

6   has been informed that the Bank acquired a majority of the assets and assumed a majority of the

7   liabilities of FRB, including the Hotel Loan and Remaining Original Loan from the FDIC.

8                As of the Petition Date, the outstanding amount due and owing under the Remaining

9   Original Loan is $10,400,000.00.  Likewise, as of the Petition Date, the outstanding principal

10  amount due and owing under the Hotel Loan is $33,580,415.83.

11               On July 14, 2010, Excell funded a $300,000 loan to the Debtor, pursuant to a secured

12  loan transaction, in order to fund the chapter 11 retainer payable to the Debtor's insolvency counsel.

13  The Excell loan is secured by a second priority deed of trust on the Hotel and Weller Court, which is

14  subordinate to the Bank's first priority deed of trust on the Hotel and Weller Court.

15           **C.    The Debtor's Cash Needs.**

16               The Debtor would suffer immediate and irreparable harm absent the interim relief

17  requested by this Motion.  Without the use of the Cash Collateral, the Debtor will not be able to

18  continue to operate the Hotel or Weller Court, as the Debtor will have no money to pay management

19  fees or other essential operating costs of either of the Properties.  Any interruption in the Debtor's

20  access to cash will prevent the Debtor from being able to provide the multitude of services to which

21  the Hotel guests are accustomed.  As a result, the Debtor would be forced to close the Hotel, thereby

22  displacing both current Hotel guests as well as guests who have not yet arrived (some of whom have

23  prepaid for their stay), and losing all of its revenue sources.  Moreover, without the use of Cash

24  Collateral, the Debtor will be unable to provide the management, security, utilities, maintenance, and

25  other services for which the tenants at Weller Court have paid and require in order to continue

26  operating their businesses.  If the Debtor breaches its landlord obligations under the Weller Court

27  leases, many of the tenants may seek early termination of their leases.  Accordingly, if the Debtor is

28  not allowed to use the Cash Collateral, a further decline in the necessary cash flows will result, the

1   value of both Properties will suffer, and both businesses will be irreparably harmed.  However, by

2   continuing to operate the Properties, the Debtor will be able to operate on a cash flow positive basis

3   to preserve the value of both of the Properties.

4           As with most debtors whose primary assets are subject to liens, the Debtor in the

5   present case has an exigent and compelling need to use Cash Collateral.  As noted by the court in

6   *Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017

7   (11th Cir. 1984):

8           A debtor, attempting to reorganize a business under Chapter 11,
            clearly has a compelling need to use "cash collateral" in its effort to
9           rebuild.  Without the availability of cash to meet daily operating
            expenses such as rent, payroll, utilities, etc., the congressional policy
10          favoring rehabilitation over economic failure would be frustrated.

11  *Id.* at 1019 (citation omitted) (upholding lower court's finding that, where secured lender's collateral

12  was worth less than the amount of the secured lender's claims, lender would nevertheless be

13  adequately protected even if debtor used gross profits obtained in the sale of debtor's vehicles for the

14  operation of its business so long as debtor remitted the wholesale value of the vehicles to the lender,

15  as the wholesale value is the amount lender would receive in an orderly disposition of its collateral).

16          **D.      The Debtor's Prior Authorization to Use Cash Collateral.**

17          On the Petition Date, the Debtor filed its "Emergency Motion For Order

18  (1) Authorizing The Debtor To Use Cash Collateral And Provide Adequate Protection To First

19  Citizens Bank And Trust Company and Excell Investment Group, LLC Pursuant To 11 U.S.C.

20  §§ 361 And 363; (2) Scheduling Final Hearing On Continued Use Of Cash Collateral, And

21  (3) Authorizing Continued Use Of Cash Collateral" [Docket No. 7] (the "Emergency Motion").

22  Pursuant to the Emergency Motion, the Debtor sought immediate use of its Cash Collateral to

23  continue the operation of its business as debtor-in-possession under chapter 11 of the Bankruptcy

24  Code.

25          After the initial hearing to consider the Emergency Motion, which took place on

26  July 20, 2010, this Court entered an interim order on the Motion [Docket No. 59] (the "First Cash

27  Collateral Order").  The First Cash Collateral Order provided, inter alia, that the Debtor was

28  permitted to use Cash Collateral on an interim basis and set forth the terms of the adequate

9

1    protection afforded to the Debtor's secured lenders on account of their interests in the Cash

2    Collateral.  The interim relief described in the First Cash Collateral Order was granted pending the

3    entry of a subsequent cash collateral order by this Court.

4         On August 24, 2010, a further cash collateral hearing took place, and based on

5    findings of fact and determinations of law made during that hearing, the Court entered a second cash

6    collateral order (the "Second Cash Collateral Order") [Docket No. 100], which allowed the Debtor to

7    continue to use Cash Collateral through December 3, 2010 in accordance with the terms therein.  See

8    Second Cash Collateral Order, ¶ 7.  This term was extended to December 17, 2010 by mutual

9    agreement between the Debtor, the Bank, and the Creditors' Committee.  See Stipulation Regarding

10   Extension of Debtor's Authority To Use Cash Collateral [Docket No. 144].  To date, there has been

11   no subsequent agreement among the parties for the further continued use of Cash Collateral.

12                                  **III.**

13                               **ARGUMENT**

14        The interests of Excell and the Bank (collectively, the "Secured Lenders") in the Cash

15   Collateral extends only to the net proceeds of the rents the Debtor will collect postpetition, after

16   operating expenses are paid.  Moreover, the Secured Lenders are adequately protected in at least the

17   following ways:

18        • The use of Cash Collateral will preserve the going concern value of the

19             Properties, which will inure to the benefit of all parties in interest, including the

20             Bank and Excell; and

21        • The Debtor has and will continue to provide both of the Secured Lenders

22             replacement liens as described in the Second Cash Collateral Order.

23   **A.    The Secured Lenders' Security Interests Do Not Extend To The Rents The
24          Debtor Seeks To Use.**

25        The threshold issue in determining whether the Secured Lenders have an interest in

26   the cash that the Debtor seeks to use is whether their security documents, as interpreted in

27   accordance with California law, provide the Secured Lenders with a security interest in that cash.

28   Pursuant to this Motion, the Debtor seeks to use only those rents from the Properties that are

1   necessary to preserve, operate and maintain the Properties.  The Secured Lenders' security interests

2   extend only to the net rents remaining <u>after</u> the satisfaction of such necessary amounts, so they have

3   no interest in the rents the Debtor seeks to use.

4         Under California law, the term "rents, issues, and profits" refers to <u>net</u> rents only.

5   *See, e.g.*, *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.,* 195 Cal. App. 3d 1032, 1069-70 (1987);

6   *Estate of Toler*, 174 Cal. App. 2d 764, 772 (1959) ("In our opinion, the terms 'rents, issues and

7   profits' . . . is substantially synonymous with the word 'income' . . . [which] has been construed to

8   mean the difference between gross operative income and gross operative expense."); *People v.*

9   *Gustafson*, 53 Cal. App. 2d 230, 239 (1942); *see also Santa Fe Fed. Sav. & Loan Ass'n. v. Oak Glen*

10  *R-Vee (In re Oak Glen R-Vee)*, 8 B.R. 213, 216 n.4 (Bankr. C.D. Cal. 1981) (secured lender entitled

11  to net rents only).  As applied to an assignment of rents, issues, and profits, this conclusion is

12  reinforced by the fact that under California law, a mortgagee's rights in rents are limited by its duty

13  as a mortgagee in possession to care for and preserve the property, *see, e.g.,* 4 B. E. Witkin,

14  *Summary of California Law*, § 102 (10th ed. 2008), and to make reasonable efforts to produce rental

15  profits.  *See Murdoch v. Clarke*, 90 Cal. 427, 438-39 (1891).

16        Indeed, the Bank's deeds of trust themselves recognize that only those rents remaining

17  after paying expenses of operating the Properties may be applied to payment of the Bank's debt.

18  Specifically, the deeds of trust securing Note 1 and Note 2 both provide that, after an event of

19  default, the Bank "shall have the right . . .  to take possession of and manage the Property and collect

20  Rents . . . and apply the net proceeds, over and above Lender's costs, against the Indebtedness." *See*

21  Deed of Trust, dated August 10, 2007, at pages 8-9, and Deed of Trust, dated November 25, 2009, at

22  page 9 (attached as Exhibits "1" and "2", respectively, to the Declaration of David Goddard filed in

23  support of the Emergency Motion [Docket No. 8).  Accordingly, the Secured Lenders are only

24  entitled to adequate protection for the net portion of the rents and profits collected from the

25  Properties, after the operating expenses are paid.

26        **B.      The Secured Lenders' Liens Are Adequately Protected.**

27        A debtor's use of estate property is governed by Bankruptcy Code section 363.

28  Section 363(c)(2) permits a debtor to use, sell, or lease cash collateral only if the entity with an

11

1    interest in the cash collateral consents or the Court authorizes such use.  Excell has consented to the

2    Debtor's use of Cash Collateral.  Although the Bank has not yet consented to the Debtor's further use

3    of Cash Collateral, the use of Cash Collateral should be permitted because the Bank's liens are

4    adequately protected.  *See, e.g., Security Leasing Partners, LP v. ProAlert, LLC (In re ProAlert,*

5    *LLC)*, 314 B.R. 436, 444 (B.A.P. 9th Cir. 2004) ("The plain language of § 363 allows a debtor to use

6    cash collateral if the secured creditor's interest is adequately protected . . .").  As described below,

7    both the Bank's and Excell's liens are adequately protected.

8               **1.    The Secured Lenders' Liens Are Adequately Protected By The
                        Preservation Of The Debtor's Going Concern Value.**
9

10              As noted above, any effort by the Secured Lenders to advocate foreclosure value or

11   bulk sale liquidation value as an appropriate method for determining adequate protection should be

12   rejected.  However, any such argument would highlight the fact that the use of Cash Collateral for

13   continued operations maintains and increases the value of the Secured Lenders' collateral.  In short,

14   allowing the use of Cash Collateral itself provides adequate protection.

15              As a preliminary matter, it is well established that a Bankruptcy Court, where

16   possible, should resolve issues in favor of reorganization:

17                      Because the ultimate benefit to be achieved by a successful
                        reorganization inures to all of the creditors of the estate, a fair
18                      opportunity must be given to the Debtors to achieve that end.  Thus,
                        while interests of the secured creditor . . . are of concern to the court,
19                      the interests of all other creditors also have bearing upon the question
                        of whether use of Cash Collateral shall be permitted during the early
20                      stages of administration.

21                      The first effort of the court must be to insure the value of the
                        collateral will be preserved.  Yet, prior to confirmation of a plan of
22                      reorganization, the test of that protection is not by the same
                        measurements applied to the treatment of a secured creditor in a
23                      proposed plan.  In order to encourage the Debtors' efforts in the
                        formative period prior to the proposal of a reorganization, the court
24                      must be flexible in applying the adequate protection standard.

25   *Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir. 1987)

26   (citation omitted); *accord In re Dynaco Corp.*, 162 B.R. at 395 (cash collateral motion); *In re*

27   *Heatron Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) (cash collateral motion).  As the *Heatron*

28   court noted in granting a debtor's motion to use cash collateral:

545985v1                                       12

> At the beginning of the reorganization process, the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization, where the evidence is conflicting.

*Id.* at 496.

Courts have routinely allowed the use of cash collateral to enhance or preserve the debtor's going concern value, even where the secured creditor was undersecured.  For example, in *Stein v. United States Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the debtor's continued operations and the creditor's "secured position can only be enhanced by the continued operation of the [the debtors' business]"; *see also In re Dynaco Corp.*, 162 B.R. at 396 (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); *In re Cann & Saul Steel Co.*, 76 B.R. 479, 487 (Bankr. E.D. Pa. 1987) (debtor entitled to use cash collateral even though the creditor was undersecured and there was no value cushion because there was "cautious optimism that the Debtor will be able to present a confirmable Plan which will result in a betterment of the financial status of all of its creditors . . .").

Moreover, if the value of secured creditor's collateral is expected to remain relatively constant, the secured creditor is deemed to be adequately protected.  *See, e.g., Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta Resources, Inc.)*, 54 F.3d 722, 730 (11th Cir. 1995) (payment of "interest" not required);  *Federal Nat'l Mortgage Assoc. v. Dacon Bolingbrook Assoc. Ltd. Partnership,* 153 B.R. 204, 210 (Bankr. N.D. Ill. 1993) (upholding bankruptcy court's allowance of use of cash collateral despite findings that the "small amount of oversecurity, which was not 'obviously not enough in itself to provide any adequate protection for any substantial decline in the value of the property'", where the bankruptcy court determined that the property value of debtor's apartment building would not further decline during period in question); *Westchase I Assoc. L.P. v. Lincoln Nat'l Life Ins. Co.*, 126 B.R. 692, 694 (Bankr. D.N.C. 1991).  This proposition of law is no less true where the collateral to be used by the debtor in possession is comprised of cash or other "soft" assets.  *See, e.g., Dynaco*, 162 B.R. at 394; *McCombs Properties VI*, 88 B.R. at 267.

Where, as in the present case, the continuation of a debtor's business achieves the realization of the full value of the collateral, the debtor's continued operations constitute adequate 13

1    protection of the secured creditor's interests in that collateral.  *See, e.g., In re Coody*, 59 B.R. 164,

2    167 (Bankr. M.D. Ga. 1986).

3                    **2.    The Secured Lenders's Liens Are Adequately Protected By
                            Replacement Liens.**

4

5                    Bankruptcy Code section 361(2) specifically contemplates that adequate protection

6    may be provided by way of additional or replacement liens to the extent that the use of property

7    results in a decrease in the value of an entity's interest.  Replacement liens are a judicially recognized

8    form of adequate protection.  *See, e.g., In re Senior Care Properties*, 137 B.R. at 520 ("The

9    replacement lien on all of the furniture, fixtures, and equipment at the facility is sufficient protection

10   of NBD's interests.").

11                   In the present case, the Debtor has previously granted replacement liens to the

12   Secured Lenders for its prior use of Cash Collateral as set forth in the Second Cash Collateral Order,

13   which replacement liens are limited to any decrease in value caused by the Debtor's use of Cash

14   Collateral and proposes to do the same for its continued use of Cash Collateral.  This grant of

15   replacement liens is without prejudice to the Debtor's ability to seek to use any Cash Collateral

16   subject to such replacement liens, or to surcharge such collateral under Bankruptcy Code

17   section 506(c).  Secured Lenders are not automatically entitled to a lien on such improvements and

18   proceeds.  As discussed in section III.C below, to the extent the Secured Lenders might claim a lien

19   on postpetition improvements to their collateral or sale proceeds under Bankruptcy Code

20   section 552(b)(1), such liens could and should be limited under Bankruptcy Code section 552(b)(2).

21           **C.    The Debtor Should Be Authorized To Use Cash Collateral Because The
                    Costs And Expenses Of Operating and Maintaining The Secured
22                  Lenders' Collateral Are Chargeable To The Collateral Under
                    Bankruptcy Code Section 506(c).**
23

24                   The costs and expenses associated with operating the Properties are absolutely

25   necessary to preserve the value of the Secured Lenders' collateral.  Therefore, independent of its

26   right to use Cash Collateral under Bankruptcy Code section 363, the Debtor should be entitled under

27   Bankruptcy Code section 506(c) to use Cash Collateral to pay the costs of operating and maintaining

28   the Properties.

14

1    Section 506(c) provides that a debtor "may recover from property securing an

2 allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of,

3 such property to the extent of any benefit to the holder of such claim."  This is true "even if the

4 trustee's use of collateral results in a diminution in value of the collateral."  5 *Collier on Bankruptcy*,

5 ¶ 552.02[5][a], at 552-14 (15th ed. Rev. 1997).

6    The legislative history of section 506(c) clearly demonstrates that Congress

7 specifically intended that a debtor may use cash collateral to pay the operating expenses incident to

8 improving and disposing of a secured creditor's collateral:  "[T]he reference to section 506(c)

9 permits broad categories of operating expenses – such as the cost of cleaning and repair services,

10 utilities, employee payroll and the like -- to be charged against pledged revenues."  H.R. 5116, 103rd

11 Cong., 2d Sess., 140 Cong. Rec. H10768 (daily ed. Oct. 4, 1994).

12    Courts have authorized the use of cash collateral for a wide variety of direct or

13 indirect expenses under section 506(c).  *See, e.g. Federal Nat'l Mortgage Assoc. v. Dacon*

14 *Bolingbrook Assoc. Ltd. Partnership,* 153 B.R. 204, 214 (Bankr. N.D. Ill. 1993) (expenses of

15 operation, maintenance and repair of apartment complex authorized to be paid from rents collected,

16 despite debtor's inability to provide adequate protection for the rents);  *Equitable Gas Co. v.*

17 *Equibank N.A. (In re McKeesport Steel Castings Co.)*, 799 F.2d 91, 94 (3d Cir. 1986) (payment to

18 utility for postpetition gas services was an expense of preserving going concern value that directly

19 benefited secured creditor whose collateral was surcharged); *In re AFCO Enters., Inc.*, 35 B.R. 512,

20 515 (Bankr. D. Utah 1983) (expenses of maintaining a resort property authorized to be paid from the

21 receipts generated on that property because preserving the resort's going-concern value benefited the

22 secured creditor); *Ford Motor Credit Co. v. Jim Kelly Ford, Ltd. (In re Jim Kelly Ford, Ltd.)*, 14

23 B.R. 812, 816-817 (N.D. Ill. 1980) (overhead and operating expenses recoverable from proceeds of

24 creditor's collateral because the expenses facilitated sale of the inventory).

25    The Debtor's use of Cash Collateral to pay the costs of managing, maintaining and

26 marketing the Properties preserves the going concern value of the Secured Lenders' respective

27 collateral.  If the Debtor is unable to pay these expenses on a regular, uninterrupted basis, then the

28 panoply of functions performed by the Debtor would have to be fulfilled by another person, no doubt

15

1    at an increased cost.  The Debtor's use of Cash Collateral benefits the Secured Lenders' respective

2    collateral by not only preserving, but increasing the value of the collateral as the Properties will

3    continue to increase in value with time if Weller Court is properly maintained, marketed and leased

4    and the Hotel is properly marketed and operated.  The Debtor is therefore entitled to recover

5    expenses of such development under Bankruptcy Code section 506(c) without regard to whether the

6    Debtor can otherwise use Cash Collateral under section 363(c)(2).  *See, e.g., Travelers Ins. Co. v.*

7    *River Oaks Ltd. Partnership (In re River Oaks Ltd. Partnership)*, 166 B.R. 94, 100 (E.D. Mich.

8    1994)(a debtor may use cash collateral under section 506(c) even though the debtor failed to met its

9    burden under section 363); *cf. In re ProAlert*, 314 B.R. at 444-45 (a debtor may use cash collateral to

10   pay professional fees if the secured creditor is adequately protected, without regard to the

11   requirements of section 506(c)).

12         **D.      The Debtor Should Be Authorized To Use Cash Collateral To Operate And
                     Maintain The Properties Based Upon The Equities Of This Case.**
13

14            Under Bankruptcy Code section 552(b), a lender's security interest does not extend to

15   postpetition property if the Court so orders "based on the equities of the case."  In determining the

16   equities of the case, the Court has "broad discretion to balance the protection of secured creditors . . .

17   against the strong public policies favoring continuation of jobs, preservation of going concern values

18   and rehabilitation of distressed debtors, generally." H.R. 5116, 103rd Cong., 2nd Sess., 140 Cong.

19   Rec. H10768 (1994).

20            In *United Virginia Bank v. Slab Fork Coal Co. (In re Slab Fork Coal Co.)*, 784 F.2d

21   1188 (4th Cir. 1986), the court remanded the case to the bankruptcy court with instructions to

22   consider the application of section 552(b) and made the following observation:

23                  [I]t should be noted that § 552(b) gives the bankruptcy court
                    considerable latitude in applying pre-petition security interests to post-
24                  petition proceeds.  As evidenced by the final clause in § 552(b), a
                    bankruptcy court may choose not to apply a pre-petition security
25                  interest to post-petition proceeds "based on the equities of the case."  It
                    appears clear from the legislative history related to § 552 that
26                  Congress undertook in that section to find an appropriate balance
                    between the rights of secured creditors and the rehabilitative purposes
27                  of the Bankruptcy Code.  The latitude afforded to the bankruptcy court
                    seems to this court to indicate that such a balancing of interests was
28                  intended in the framing of § 552.

16

784 F.2d at 1191.  *See also In re Lawrence*, 41 B.R. 36, 38 (Bankr. D. Minn. 1984) (in applying

section 552(b), "the court evaluates the expenditures of time, labor, and funds relating to the

collateral, the relative position of the secured party, and the overall rehabilitative theme of

bankruptcy law"), *aff'd*, 56 B.R. 727 (D. Minn. 1984).

In the present case, the continued operation of the Properties will require the use of

the rents collected and the efforts of the Debtor.  Under those circumstances, limiting any lien on

revenues generated postpetition would be appropriate under section 552(b).  As was stated by the

court in *In re Cafeteria Operators, L.P.*, 299 B.R. 400 (Bankr. N.D. Tex. 2003):

> [T]he Court finds that the equities of this case warrant a finding that the
> Bank Group's security interest does not flow to all cash generated by
> Debtors, since all the cash is not proceeds of Bank Group's secured
> interest in inventory, but instead represents, in large part, the proceeds of
> Debtors' post-petition toil and effort.  Bank Group's pre-petition security
> interest continues in any cash realized by Debtors as the result of the sale
> of the inventory, but, based on this record, only to that extent.  To grant
> Bank Group a blanket lien on all of Debtors' cash generated post-petition
> would represent a windfall to Bank Group, in the face of Debtors'
> utilization of estate resources, *i.e.* the services of their employees, to
> increase the value of Bank Group's collateral, and would unfairly deplete
> the funds available for general unsecured creditors.

*Id.* at 410.

The Court need not at this point make any determination with respect to the

applicability of section 552(b) in the present case.  Nonetheless, because this case exemplifies a

situation in which a creditor's collateral can be surcharged under section 506(c) and the equities

permit a restriction on the creditor's liens under section 552(b), the use of Cash Collateral is clearly

appropriate.

**E.      The Debtor Should Be Authorized To Borrow $75,000 To Pay the Hilton Fee.**

On November 4, 2010, the Debtor filed the "Amended Plan of Reorganization

(November 4, 2010)" [Docket No. 141] (the "Amended Plan"), which contemplates Debtor's

reorganization strategy, which involves a legally binding commitment by the Debtor's limited

partner, 3D Investments IV, L.P. ("3D"), to invest $10,000,000 in the Debtor in order to re-brand the

Hotel as a Doubletree pursuant to a franchise license agreement (the "Doubletree Agreement") with

Hilton.  The Debtor is confident that the increased revenue from and profitability of the Hotel as a

17

1   result of the Hotel being re-branded as a Doubletree, together with the Debtor's existing assets and

2   the multi-million capital infusion to be made by the Debtor's limited partner, will be sufficient to pay

3   all of the property improvements that are required by Hilton pursuant to the Doubletree Agreement,

4   other deferred maintenance items at the Hotel, ongoing debt service obligations to the Bank on

5   account of its reinstated claims, and the payment, in full, of all other claims as required under

6   Bankruptcy Code § 1124.  See Amended Plan, pp. 16 – 17.

7          Furthermore, the implementation of the Doubletree Agreement and consequent

8   continuity of ownership of the Subject Properties will ensure that the 170 employees who work at

9   the Hotel will continue to be employed.  Prior to the Hearing, the Debtor anticipates filing a further

10  amended plan to address certain issues that have been raised by the Creditors' Committee and to

11  increase the amount of the new capital contribution to $10,000,000.

12          The Debtor has not yet finalized a formal Doubletree franchise agreement.  The

13  Debtor has entered into a letter of intent (the "LOI") with Hilton and has completed and submitted

14  the entire Hilton franchise application to Hilton.  The LOI includes a 15 page property improvement

15  plan ("PIP") that has been fully-negotiated and finalized between the Debtor and Hilton over the past

16  two months.  The Debtor has asked for authority from Hilton to file the LOI and PIP with the Court.

17  In the meantime, the Debtor, with Hilton's permission, has provided copies of the LOI and the PIP to

18  the Bank and the Creditors' Committee on a confidential basis.  The Debtor has been informed by

19  Hilton that its franchise application will be approved by mid-December 2010.  The Debtor must pay

20  Doubletree a $75,000 fee as part of the approval process.

21          The Debtor could have sought Court authorization to use Cash Collateral to pay this

22  fee.  The Bank has indicated that it wants to proceed with a forced sale of the Hotel and the Debtor

23  assumes that the Bank would object to use of its Cash Collateral to fund the fee to Hilton.  To avoid

24  the cost of litigation over this issue or any delay in approval of the Doubletree Agreement the limited

25  partner has agreed to lend the Debtor $75,000 on an unsecured simple administrative priority basis.

26  The loan will be due upon confirmation of a plan or conversion of the Debtor's case to a case under

27  chapter 7.  It will not have priority over other ordinary course administrative claims.

28

18

1    Pursuant to Bankruptcy Code § 364(b) a debtor in possession can be authorized to

2  borrow money on a simple administrative priority basis after notice and a hearing, if it is a

3  reasonable exercise of the Debtor's business judgment.  The $75,000 fee is being paid for the

4  franchise approval process with Hilton.  The increased revenue that can be generated by the Hotel if

5  the Doubletree Agreement is approved will enable the Debtor to proceed with the Amended Plan,

6  under which all creditors are unimpaired.  The Debtor is not seeking authorization to enter into the

7  Doubletree Agreement at this time.  That authority is sought pursuant to the Amended Plan.  At this

8  time the Debtor seeks only the authority to borrow the funds to pay the $75,000 administrative fee.

9                                            **IV.**

10                                       **CONCLUSION**

11    **WHEREFORE**, the Debtor respectfully moves the Court for entry of an order

12  granting the relief requested herein and such other relief as the Court deems just and proper.

13

14  DATED:  November 24, 2010          */s/  Neeta Menon*
                                      JEFFREY C. KRAUSE,
15                                     CHRISTINE M. PAJAK and
                                      NEETA MENON, Members of
16                                     STUTMAN, TREISTER & GLATT
                                      PROFESSIONAL CORPORATION
17                                     Reorganization Counsel for Debtor and
                                      Debtor in Possession
18

19

20

21

22

23

24

25

26

27

28

1

## **Declaration of David Goddard**

2

3          1.        I am over 18 years old.  I have personal knowledge of the statements set forth

4    below except for those facts stated on information and belief, and as to those facts, I am informed

5    and believe them to be true.  If called upon to do so, I could and would testify competently to the

6    matters stated in this Declaration because I know them of my own personal knowledge.

7          2.        I am the Chief Financial Officer ("CFO") of Little Tokyo Partners, L.P., the

8    debtor and debtor in possession in the above-captioned case (the "Debtor").  I have served as CFO of

9    the Debtor since May 2006.  In addition to serving as CFO of the Debtor, I am also CFO for

10   affiliated companies.

11          3.        As the CFO of the Debtor, I am in charge of strategic and financial planning,

12   financing, and business operations.  I am involved on a day-to-day basis with all major decisions

13   made by the Debtor.  Accordingly, I have personal knowledge of all major aspects of the Debtor's

14   ongoing business affairs, day-to-day business operations, financial condition, and books and records.

15          4.        Based upon my personal knowledge of the Debtor and its business operations,

16   as well as the information contained in the Debtor's books and records and assembled under my

17   supervision and direction, I am qualified to give this Declaration on behalf of the Debtor.

18          5.        I submit this Declaration in support of certain of "Motion for Order Extending

19   Debtor's Authority to Use Cash Collateral" (the "Motion").[5]  Except as otherwise indicated, all facts

20   set forth in this Declaration are based upon my personal knowledge, my review of relevant

21   documents, reports prepared for me by the employees of the two management companies that the

22   Debtor employs to operate and manage its businesses, discussions I have had with these employees

23   or my opinion based upon my experience, expertise and knowledge of the Debtor's operations,

24   financial condition and the industry.  If I were called upon to testify, I could and would testify

25   competently as to my knowledge regarding the veracity of the facts set forth herein.

26

27   _____

[5]   Terms not otherwise defined herein shall have the same meanings ascribed to them in the
28        Motion.

545985v1

Case 2:10-bk-39113-BR    Doc 147    Filed 11/24/10    Entered 11/24/10 15:35:42    Desc
Main Document    Page 21 of 29

6.      The Debtor seeks to use Cash Collateral, pursuant to the terms of a cash collateral budget attached hereto as Exhibit "1" (the "Budget"), to continue to market, lease, manage and operate the Hotel and Weller Court (hereinafter, collectively referred to as the "Properties"), in the ordinary course of business, to ensure that the transition into bankruptcy is seamless for the guests, customers, employees and lessees of the Properties. Specifically, the Debtor seeks authority to use Cash Collateral through March 3, 2011. According to the Budget, the Debtor anticipates that the Debtor will continue build Cash Collateral during this eleven-week period. In other words, the Debtor's use of Cash Collateral will enable the aggregate value of the Secured Lenders' collateral to increase over the Budgeted period.

7.      The Secured Lenders' lien interests will be adequately protected by: (1) the maintenance and preservation of the going concern value of their respective collateral; and (2) replacement liens in any proceeds generated from the post-petition use of the Properties.

8.      The Debtor would suffer immediate and irreparable harm absent the relief requested in the Cash Collateral Motion. Without the use of Cash Collateral, the Debtor will not be able to continue to operate the Hotel or Weller Court, as the Debtor will have no money to pay management fees or other essential operating costs of either of the Properties. Any interruption in the Debtor's access to cash will prevent the Debtor from being able to provide the multitude of services to which the Hotel guests are accustomed. As result, the Debtor would be forced to close the Hotel, thereby displacing both employees and current Hotel guests as well as guests who have not yet arrived (some of whom have prepaid for their stay), and losing all of its revenue sources.

9.      In addition, without the use of Cash Collateral, the Debtor will be unable to provide the management, security, utilities, maintenance, and other services for which the tenants at Weller Court have paid and require in order to continue operating their businesses. If the Debtor breaches its landlord obligations under the Weller Court leases, many of the tenants may seek early termination of their leases.

10.     Notably, the Budget provides for only those expenses necessary to maintain the ordinary operation of the Debtor's business and does not seek to pay any expenses related to the Debtor's bankruptcy case.

1          11.    Accordingly, if the Debtor is not allowed to use Cash Collateral, a further

2    decline in the necessary cash flows will result, the value of both Properties will suffer, and both

3    businesses will be irreparably harmed. However, by continuing to operate the Properties, the Debtor

4    will be able to operate on a cash flow positive basis to preserve the value of both of the Properties.

5          12.    Excell has consented to the Debtor's further use of Cash Collateral but, to

6    date, the Bank has not consented. It is critical to the Debtor's operations and the preservation of the

7    Secured Lenders' collateral that the Debtor be permitted to continue the use of Cash Collateral.

8          I declare under penalty of perjury under the laws of the United States of America that

9    the foregoing is true and correct.

10          Executed this 24TH day of November, 2010, at Los Angeles, California.

11

12                                        _____

13                                              DAVID GODDARD

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

iv

*__EXHIBIT 1__*

| WELLER + HOTEL ROLLUP<br>Little Tokyo Partners, LP<br>December 4, 2010 to March 4, 2011<br>13-Week Budget<br>Account Name | WEEK 1<br>12/04/10 -<br>12/10/10 | WEEK 2<br>12/11/10 -<br>12/17/10 | WEEK 3<br>12/18/10 -<br>12/24/10 | WEEK 4<br>12/25/10 -<br>12/31/10 | WEEK 5<br>01/01/11 -<br>01/07/11 | WEEK 6<br>01/08/11 -<br>01/14/11 | WEEK 7<br>01/15/11 -<br>01/21/11 | WEEK 8<br>01/22/11 -<br>01/28/11 | WEEK 9<br>01/29/11 -<br>02/04/11 | WEEK 10<br>02/04/11 -<br>02/11/11 | WEEK 11<br>02/12/11 -<br>02/18/11 | WEEK 12<br>02/19/11 -<br>02/25/11 | WEEK 13<br>02/26/11 -<br>03/04/11 | TOTAL<br>13-WEEK<br>PERIOD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUE | | | | | | | | | | | | | | |
| Weller Court | 103,780 | 20,510 | 17,833 | 12,200 | 102,450 | 22,740 | 17,833 | 20,510 | 101,080 | 22,740 | 17,833 | 20,510 | 101,080 | 581,099 |
| Kyoto Grand Hotel | 193,263 | 203,314 | 145,118 | 149,689 | 200,254 | 201,395 | 264,574 | 254,775 | 314,270 | 298,074 | 253,678 | 178,515 | 277,430 | 2,934,348 |
| TOTAL REVENUE | 297,043 | 223,824 | 162,951 | 161,889 | 302,704 | 224,135 | 282,407 | 275,285 | 415,350 | 320,814 | 271,511 | 199,025 | 378,510 | 3,515,447 |
| EXPENSES | | | | | | | | | | | | | | |
| Weller Court | 21,950 | 42,750 | 10,000 | 4,000 | 21,000 | 34,050 | 4,500 | 8,950 | 13,500 | 33,050 | 10,500 | 950 | 7,500 | 212,700 |
| Kyoto Grand Hotel | 324,482 | 145,018 | 257,322 | 27,445 | 263,252 | 233,002 | 270,183 | 42,661 | 268,226 | 261,530 | 239,352 | 54,454 | 276,958 | 2,663,885 |
| TOTAL EXPENSES | 346,432 | 187,768 | 267,322 | 31,445 | 284,252 | 267,052 | 274,683 | 51,611 | 281,726 | 294,580 | 249,852 | 55,404 | 284,458 | 2,876,585 |
| NET OPERATING INCOME | (49,389) | 36,057 | (104,372) | 130,443 | 18,452 | (42,918) | 7,724 | 223,674 | 133,624 | 26,234 | 21,659 | 143,621 | 94,052 | 638,862 |
| Beginning Cash Balance | 1,557,168 | 1,507,780 | 1,543,836 | 1,439,464 | 1,569,908 | 1,588,359 | 1,545,442 | 1,553,166 | 1,776,840 | 1,910,464 | 1,936,698 | 1,958,357 | 2,101,978 | 1,557,168 |
| +/<-> Net Operating Cash | (49,389) | 36,057 | (104,372) | 130,443 | 18,452 | (42,918) | 7,724 | 223,674 | 133,624 | 26,234 | 21,659 | 143,621 | 94,052 | 638,862 |
| +/<-> Non Cash BS Items | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash Balance | 1,507,780 | 1,543,836 | 1,439,464 | 1,569,908 | 1,588,359 | 1,545,442 | 1,553,166 | 1,776,840 | 1,910,464 | 1,936,698 | 1,958,357 | 2,101,978 | 2,196,030 | 2,196,030 |

24

| WELLER COURT<br>Little Tokyo Partners, LP<br>December 4, 2010 to March 4, 2011<br>13-Week Budget<br>Account Name | WEEK 1<br>12/04/10 -<br>12/10/10 | WEEK 2<br>12/11/10 -<br>12/17/10 | WEEK 3<br>12/18/10 -<br>12/24/10 | WEEK 4<br>12/25/10 -<br>12/31/10 | WEEK 5<br>01/01/11 -<br>01/07/11 | WEEK 6<br>01/08/11 -<br>01/14/11 | WEEK 7<br>01/15/11 -<br>01/21/11 | WEEK 8<br>01/22/11 -<br>01/28/11 | WEEK 9<br>01/29/11 -<br>02/04/11 | WEEK 10<br>02/04/11 -<br>02/11/11 | WEEK 11<br>02/12/11 -<br>02/18/11 | WEEK 12<br>02/19/11 -<br>02/25/11 | WEEK 13<br>02/26/11 -<br>03/04/11 | TOTAL<br>13-WEEK<br>PERIOD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | |
| Rent | 85,000 | 14,500 | 4,200 | 9,000 | 82,000 | 16,500 | 4,200 | 14,500 | 82,000 | 16,500 | 4,200 | 14,500 | 82,000 | 429,100 |
| Rent Storage | 1,480 | - | - | - | 1,480 | - | - | - | 1,480 | - | - | - | 1,480 | 5,920 |
| Rent Parking Monthly | - | - | 12,000 | - | - | - | 12,000 | - | - | - | 12,000 | - | - | 36,000 |
| Recov Insurance | 300 | 120 | 33 | - | 300 | 130 | 33 | 120 | 300 | 130 | 33 | 120 | 300 | 1,919 |
| Recov Marketing | - | - | - | - | 1,370 | - | - | - | - | - | - | - | - | 1,370 |
| Recov Taxes Property | 3,400 | 1,400 | 320 | 800 | 3,600 | 1,500 | 320 | 1,400 | 3,600 | 1,500 | 320 | 1,400 | 3,600 | 23,160 |
| Recov Utilities | 1,200 | 90 | 130 | - | 900 | 210 | 130 | 90 | 900 | 210 | 130 | 90 | 900 | 4,980 |
| Recov CAM Est | 12,400 | 4,400 | 1,150 | 2,400 | 12,800 | 4,400 | 1,150 | 4,400 | 12,800 | 4,400 | 1,150 | 4,400 | 12,800 | 78,650 |
| **TOTAL REVENUE** | 103,780 | 20,510 | 17,833 | 12,200 | 102,450 | 22,740 | 17,833 | 20,510 | 101,080 | 22,740 | 17,833 | 20,510 | 101,080 | 581,099 |
| **EXPENSES** | | | | | | | | | | | | | | |
| Administrative | 500 | - | - | - | 500 | - | - | - | 500 | - | - | - | - | 1,500 |
| Cleaning | 2,000 | - | - | 1,000 | - | - | 1,000 | 2,000 | - | - | 1,000 | - | 2,000 | 9,000 |
| Electrical | - | - | - | - | - | - | - | - | - | - | - | 500 | 500 | 1,000 |
| Elevator | - | 5,000 | - | - | 5,000 | - | - | 2,500 | - | - | - | - | - | 12,500 |
| Fire Life Safety | - | 500 | - | - | - | - | 500 | - | - | - | 500 | - | - | 1,500 |
| Grounds | 450 | - | - | - | - | - | - | 450 | - | - | - | 450 | - | 1,350 |
| HVAC | 5,000 | - | 2,000 | - | 5,000 | - | - | - | 2,000 | - | 2,000 | - | 5,000 | 21,000 |
| Landscape | - | 3,200 | - | - | - | 2,000 | - | - | - | 2,000 | - | - | - | 7,200 |
| PR Wages/Taxes/Benefits | - | 13,500 | - | - | - | 11,500 | - | - | - | 11,500 | - | - | - | 36,500 |
| Plumbing | 1,000 | - | - | - | 500 | - | - | 1,000 | 1,000 | - | - | - | - | 3,500 |
| Prof Legal Unlawful Detainer | 3,000 | - | - | 3,000 | - | - | - | 3,000 | - | - | - | - | - | 9,000 |
| Project Mgr | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | - | 15,000 |
| Repairs & Maintenance | 5,000 | - | 5,000 | - | - | - | - | - | 5,000 | - | 5,000 | - | - | 20,000 |
| Security | - | 7,000 | - | - | - | 7,000 | - | - | - | 7,000 | - | - | - | 21,000 |
| Util Electricity | - | 7,000 | - | - | - | 7,000 | - | - | - | 7,000 | - | - | - | 21,000 |
| Util Gas | - | 550 | - | - | - | 550 | - | - | - | 550 | - | - | - | 1,650 |
| Util Water Potable | - | 4,000 | - | - | - | 4,000 | - | - | - | 4,000 | - | - | - | 12,000 |
| Util Sewer | - | 2,000 | - | - | - | 2,000 | - | - | - | 1,000 | - | - | - | 5,000 |
| Util Refuse Removal | - | - | 3,000 | - | - | - | 3,000 | - | - | - | 2,000 | - | - | 8,000 |
| DT Tenant Repairs/Improvements | - | - | - | - | 5,000 | - | - | - | - | - | - | - | - | 5,000 |
| **TOTAL EXPENSES** | 21,950 | 42,750 | 10,000 | 4,000 | 21,000 | 34,050 | 4,500 | 8,950 | 13,500 | 33,050 | 10,500 | 950 | 7,500 | 212,700 |
| **NET OPERATING INCOME** | 81,830 | (22,240) | 7,833 | 8,200 | 81,450 | (11,310) | 13,333 | 11,560 | 87,580 | (10,310) | 7,333 | 19,560 | 93,580 | 368,399 |
| **Beginning Cash Balance** | 1,197,528 | 1,279,358 | 1,257,118 | 1,264,951 | 1,273,151 | 1,354,601 | 1,343,291 | 1,356,624 | 1,368,184 | 1,455,764 | 1,445,454 | 1,452,787 | 1,472,347 | 1,197,528 |
| +/<-> Net Operating Cash | 81,830 | (22,240) | 7,833 | 8,200 | 81,450 | (11,310) | 13,333 | 11,560 | 87,580 | (10,310) | 7,333 | 19,560 | 93,580 | 368,399 |
| +/<-> Non Cash BS Items | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | 1,279,358 | 1,257,118 | 1,264,951 | 1,273,151 | 1,354,601 | 1,343,291 | 1,356,624 | 1,368,184 | 1,455,764 | 1,445,454 | 1,452,787 | 1,472,347 | 1,565,927 | 1,565,927 |

| KYOTO GRAND HOTEL Little Tokyo Partners, LP December 4, 2010 to March 4, 2011 13-Week Budget | WEEK 1 12/04/10 - 12/10/10 | WEEK 2 12/11/10 - 12/17/10 | WEEK 3 12/18/10 - 12/24/10 | WEEK 4 12/25/10 - 12/31/10 | WEEK 5 01/01/11 - 01/07/11 | WEEK 6 01/08/11 - 01/14/11 | WEEK 7 01/15/11 - 01/21/11 | WEEK 8 01/22/11 - 01/28/11 | WEEK 9 01/29/11 - 02/04/11 | WEEK 10 02/05/11 - 02/11/11 | WEEK 11 02/12/11 - 02/18/11 | WEEK 12 02/19/11 - 02/25/11 | WEEK 13 02/26/11 - 03/04/11 | TOTAL 13-WEEK PERIOD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Account Name | | | | | | | | | | | | | | |
| **REVENUE** | | | | | | | | | | | | | | |
| Rooms | 122,654 | 121,251 | 94,392 | 114,699 | 135,241 | 158,526 | 190,671 | 183,609 | 226,480 | 214,343 | 182,581 | 128,483 | 181,489 | 2,054,418 |
| Food and Beverage | 59,045 | 70,607 | 41,366 | 23,812 | 52,116 | 28,874 | 54,255 | 52,246 | 62,145 | 64,510 | 52,563 | 36,989 | 82,335 | 680,861 |
| Other Misc Departments | 11,565 | 11,457 | 9,360 | 11,178 | 12,897 | 13,995 | 19,648 | 18,920 | 25,645 | 19,221 | 18,534 | 13,043 | 13,606 | 199,069 |
| Interest Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL REVENUE** | 193,263 | 203,314 | 145,118 | 149,689 | 200,254 | 201,395 | 264,574 | 254,775 | 314,270 | 298,074 | 253,678 | 178,515 | 277,430 | 2,934,348 |
| **EXPENSES** | | | | | | | | | | | | | | |
| Cost of Sales | 14,112 | 16,875 | 9,886 | 5,691 | 12,456 | 6,901 | 12,967 | 12,487 | 14,853 | 15,418 | 12,563 | 8,840 | 19,678 | 162,726 |
| Cleaning Supplies | 773 | 813 | 580 | 599 | 801 | 806 | 1,058 | 1,019 | 1,257 | 1,192 | 1,015 | 714 | 1,110 | 11,737 |
| Credit Card Discounts | 14,093 | 508 | 339 | 554 | 14,282 | 468 | 527 | 541 | 971 | 15,463 | 320 | 392 | 771 | 49,229 |
| Guest Supplies | 2,319 | 2,440 | 1,741 | 1,796 | 2,403 | 2,417 | 3,175 | 3,057 | 3,771 | 3,577 | 3,044 | 2,142 | 3,329 | 35,212 |
| Linens | - | 3,231 | - | - | - | 1,960 | - | - | - | 2,089 | - | - | 2,055 | 9,335 |
| Radio & Television | - | - | - | 6,230 | - | - | - | 6,230 | - | - | - | - | 6,230 | 18,690 |
| Reservation Expense | - | - | 11,540 | - | - | 14,693 | - | - | - | 13,418 | - | - | 14,286 | 53,937 |
| Sales & Marketing | 4,445 | 4,676 | 3,338 | 3,443 | 4,606 | 4,632 | 6,085 | 5,860 | 7,228 | 6,856 | 5,835 | 4,106 | 6,381 | 67,490 |
| Travel Agent Commission | 2,187 | 2,163 | 1,707 | 2,052 | 2,401 | 2,797 | 2,646 | 2,548 | 3,143 | 2,981 | 2,537 | 1,785 | 2,774 | 31,720 |
| Uniforms (Cleaning) | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 361 | 4,693 |
| Adm Equipment | - | - | 1,965 | - | - | - | 1,965 | - | - | - | - | 1,965 | - | 5,895 |
| Adm Printing & Office Supplies | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,250 |
| Payroll & Taxes | 169,256 | - | 182,089 | - | 202,044 | - | 200,133 | - | 206,458 | - | 191,006 | - | 196,022 | 1,347,007 |
| Health / Dental Insurances | - | 29,000 | - | - | - | 29,000 | - | - | - | 29,000 | - | - | - | 87,000 |
| Engineering Labor | - | 74,150 | - | - | - | 74,150 | - | - | - | 74,150 | - | - | - | 222,450 |
| Mgmt Fee Asset Mgr | - | 1,000 | - | 1,000 | - | 1,000 | - | 1,000 | - | - | 1,000 | - | 1,000 | 6,000 |
| Mgmt Fee Hotel Mgmt Co | - | - | 24,858 | - | - | - | 19,232 | - | - | - | - | 27,122 | - | 71,212 |
| Parking Labor | 13,000 | 2,800 | 13,000 | - | 13,000 | 2,800 | 13,000 | - | 13,000 | 2,800 | 13,000 | - | 13,000 | 99,400 |
| Prof Legal - ADA Lawsuit | 2,000 | - | - | - | - | - | - | - | 2,000 | - | - | - | - | 4,000 |
| Project Mgr - Deferred Maintenance | 4,000 | - | - | - | 4,000 | - | - | - | 4,000 | - | - | - | - | 12,000 |
| Repair & Maintenance | 6,223 | 6,547 | 4,673 | 4,820 | 6,448 | 6,485 | 8,519 | 8,204 | 10,119 | 9,598 | 8,168 | 5,748 | 8,933 | 94,486 |
| Telephone & Postage | - | - | 850 | 500 | - | - | - | - | 850 | 500 | - | 850 | 500 | 4,050 |
| Transportation Expense | 193 | 203 | 145 | 150 | 200 | 201 | 265 | 255 | 314 | 298 | 254 | 179 | 277 | 2,934 |
| Utilities | 91,270 | - | - | - | - | 84,082 | - | - | - | 84,079 | - | - | - | 259,431 |
| **TOTAL EXPENSES** | 324,482 | 145,018 | 257,322 | 27,445 | 263,252 | 233,002 | 270,183 | 42,661 | 268,226 | 261,530 | 239,352 | 54,454 | 276,958 | 2,663,885 |
| **NET OPERATING INCOME** | (131,219) | 58,297 | (112,205) | 122,243 | (62,998) | (31,608) | (5,609) | 212,114 | 46,044 | 36,544 | 14,326 | 124,061 | 472 | 270,463 |
| **Beginning Cash Balance** | 359,640 | 228,421 | 286,718 | 174,513 | 296,756 | 233,758 | 202,150 | 196,541 | 408,655 | 454,700 | 491,244 | 505,570 | 629,631 | 359,640 |
| +/<-> Net Operating Cash | (131,219) | 58,297 | (112,205) | 122,243 | (62,998) | (31,608) | (5,609) | 212,114 | 46,044 | 36,544 | 14,326 | 124,061 | 472 | 270,463 |
| +/<-> Non Cash BS Items | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | 228,421 | 286,718 | 174,513 | 296,756 | 233,758 | 202,150 | 196,541 | 408,655 | 454,700 | 491,244 | 505,570 | 629,631 | 630,103 | 630,103 |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

1901 Avenue of the Stars, 12th Floor, Los Angeles, CA  90067

A true and correct copy of the foregoing document described as  **MOTION FOR ORDER EXTENDING DEBTOR'S AUTHORITY TO USE CASH COLLATERAL AMD TO BORROW MONEY ON UNSECURED ADMINISTRATIVE PRIORITY BASIS; DECLARATION OF DAVID GODDARD IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 24, 2010,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

> Dan E Chambers on behalf of Interested Party Courtesy NEF
> dan.chambers@troutmansanders.com
>
> Russell Clementson on behalf of U.S. Trustee United States Trustee (LA)
> russell.clementson@usdoj.gov
>
> Peter Csato on behalf of Interested Party Courtesy NEF
> efiling@frandzel.com, banderson@frandzel.com;pcsato@frandzel.com
>
> Michael G Fletcher on behalf of Interested Party Courtesy NEF
> mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com
>
> Bernard R Given on behalf of Interested Party Courtesy NEF
> bgiven@frandzel.com, efiling@frandzel.com;shom@frandzel.com;bgiven@frandzel.com
>
> Mette H Kurth on behalf of Creditor Committee Official Committee of Unsecured Creditors
> kurth.mette@arentfox.com
>
> Mary D Lane on behalf of Creditor Crestline Hotels & Resorts, Inc.
> mlane@pszjlaw.com
>
> Samuel R Maizel on behalf of Debtor Little Tokyo Partners, L.P.
> smaizel@pszjlaw.com, smaizel@pszjlaw.com
>
> Neeta Menon on behalf of Debtor Little Tokyo Partners, L.P.
> nmenon@stutman.com
>
> Kenneth N Russak on behalf of Counter-Defendant First Citizens Bank & Trust Company
> krussak@frandzel.com, efiling@frandzel.com;ltokubo@frandzel.com
>
> Meghan C Sherrill on behalf of Counter-Claimant Little Tokyo Partners, L.P.
> meghan.sherrill@troutmansanders.com
>
> United States Trustee (LA)
> ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
545846v1

**F 9013-3.1.PROOF.SERVICE**

27

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **November 24, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

*See Exhibit A, which is attached hereto and incorporated herein by reference*

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____**,** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 24, 2010 | Joanne B. Stern | *Joanne B. Stern* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
545846v1

**F 9013-3.1.PROOF.SERVICE**

28

## Exhibit A

## (SERVED BY U.S. MAIL)

Little Tokyo Partners (6325)
General Service List
Doc #542310 – Rev. 08/26/10

Little Tokyo Partners LP
1880 Century Park East Suite 810
Los Angeles, CA 90067

Office of the US Trustee
725 S Figueroa St
Suite 2600
Los Angeles, CA 90017

Frandzel Robins Bloom Csato
Peter Csato, Esq
6500 Wilshire Blvd 17th Fl
Los Angeles, CA 90048-4920

First Citizens Bank and Trust
1801 Century Park East Suite 800
Los Angeles, CA 90067

Excell Investment Group, LLC
23586 Calabasas Rd. #100
Calabasas, CA 91302

Internal Revenue Service
PO Box 21126
Philadelphia, PA 19114

Counsel for the Official Committee of
Unsecured Creditors
Mette Kurth, Esq. / M. Douglas Flahaut, Esq.
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013

Able Engineering Services
Contact: Jim Johnson, VP
868 Folsom Street
San Francisco, CA 94107

Waxie Sanitary Supply
Attn:  John Olea, Corp. Credit Mngr.
PO Box 81006
San Diego, CA 92138

Room Service Amenities
Attn:  Charmaine Gardner, Accounting
Administrator
1010 Campus Drive West
Morganville, NJ 07751

LA DWP
PO Box 30808
Los Angeles, CA 90030

Crestline Hotels & Resorts
Contact: Elizabeth Lieberman, Esq.
3950 University Drive Suite 301
Fairfax, VA 22030

State of California
Board of Equalization
PO Box 942870
Sacramento, CA 94279

Bank of America N.A.
Attn: Jerri Shephard
1185 Avenue of the Americas, 16th Floor
New York, NY 10035

Wells Fargo Bank, N.A.
Attn: Michael Barry
433 North Camden Drive
Beverly Hills, CA 90210

Requests for Notice:

Samuel R. Maizel, Esq.
Mary D. Lane, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Fl.
Los Angeles, CA  90067

## SERVED BY OVERNIGHT DELIVERY:

Hon. Barry Russell
U.S. Bankruptcy Court
255 E Temple St Ste 1660
Los Angeles, CA  90012-3543

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
545846v1

**F 9013-3.1.PROOF.SERVICE**

29