JEFFREY C. KRAUSE (STATE BAR NO. 94053), and
jkrause@stutman.com
CHRISTINE M. PAJAK (STATE BAR NO. 217173), Members of
cpajak@stutman.com
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone:    (310) 228-5600
Telecopy:    (310) 228-5788

Reorganization Counsel for
Debtor and Debtor in Possession

Debtor's Mailing Address:
1888 Century Park East, Suite 810
Los Angeles, CA 90067

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:10-39113-BR |
| LITTLE TOKYO PARTNERS, L.P., a Delaware limited partnership, | Chapter 11 |
| Debtor. | **MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF JOSEPH DANESHGAR IN SUPPORT OF MOTION FOR ORDER (1) APPROVING SETTLEMENT WITH FIRST-CITIZENS BANK & TRUST COMPANY, (2) DISMISSING CHAPTER 11 CASE PURSUANT TO BANKRUPTCY CODE SECTION 1112(b), AND (3) DISMISSING THE ADVERSARY PROCEEDING WITH PREJUDICE** |

Hearing

Date:    TBD
Time:    TBD
Ctrm:    Courtroom 1668
         255 E. Temple St.
         Los Angeles, CA  90012

547961v7

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.   STATEMENT OF FACTS ...................................................................................1

    A.   The Debtor's Business...........................................................................1

    B.   Debtor's Secured Debt. .........................................................................1

    C.   The ADA Litigation...............................................................................2

    D.   Events Leading Up To Chapter 11 Filing...............................................2

    E.   Events During the Chapter 11 Case. ......................................................3

        1.   Retention Of Professionals. ......................................................4

        2.   Statutory Fees...........................................................................5

    F.   The Debtor's Unsecured Claims and Other Claims. ................................5

    G.   Settlement Agreement.............................................................................6

II.  ARGUMENT ................................................................................................8

    A.   This Court Should Approve the Settlement Agreement Pursuant to
Bankruptcy Rule 9019 As It is Fair, Reasonable, and in the Best Interests
of all Creditors. .....................................................................................8

    B.   A Chapter 11 Case May Be Dismissed Voluntarily By A Debtor Under
11 U.S.C. § 1112(b) Unless Dismissal Would Cause Some "Plain Legal
Prejudice" To Creditors. .......................................................................10

III. CONCLUSION...............................................................................................13

    DECLARATION OF JOSEPH DANESHGAR ......................................................14

    A.   The Debtor's Operations. ......................................................................15

    B.   Events Leading Up To Chapter 11 Filing...............................................15

    C.   Events During the Chapter 11 Case. ......................................................15

    D.   Negotiations and the Settlement Agreement...........................................16

    E.   The ADA Litigation...............................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.),
    762 F.2d 185, 189 (2d Cir. 1985)................................................................9

Benson v. Newman,
    409 U.S. 1039 (1972).....................................................................................9

Cosoff v. Rodman (In re W.T. Grant Co.),
    699 F.2d 599, 608 (2d Cir. 1983), *cert. denied* 464 U.S. 822 (1983)..............9

In re Evans,
    2002 Bankr. LEXIS 1932 (Bankr. D. Idaho 2002).......................................10

In re Geller,
    74 B.R. 685, 689 (Bankr. E.D. Pa. 1987) ...............................................10, 11

Gill v. Hall (In re Hall),
    15 B.R. 913, 917 (Bankr. 9th Cir. 1981)........................................................11

In re Gonic Realty Trust,
    909 F.2d 624, 626 (1st Cir. 1990)..................................................................10

In re Hospitality Assocs. of Tappan Zee Ltd. P'ship,
    102 B.R. 369, 372 (Bankr. S.D.N.Y. 1989)...................................................10

In re Int'l Airport Inn P'ship.,
    517 F.2d 510 (9th Cir. 1975) ..................................................................10, 11

In re Kimble,
    96 B.R. 305, 307-08 (Bankr. D. Mont. 1988)................................................11

In re Lee Way Holding Co.,
    120 B.R. 881, 891 (Bankr. S.D. Ohio 1990)...................................................9

Martin v. Kane (In re A & C Properties),
    784 F.2d 1377, 1380-81 (9th Cir. 1986) ........................................................8

In re Midland Marina, Inc.,
    259 B.R. 683 (8th Cir. B.A.P. 2001)..............................................................11

In re Mountain Highlands, LLC,
    2008 Bankr. LEXIS 3336 (Bankr. D. N.M. 2008).........................................10

**Page(s)**

**CASES**

Newman v. Stein,
    464 F.2d 689, 698 (2d Cir. 1972)........................................................................9

In re OptinRealBig.com, LLC,
    345 B.R. 277, 283 (Bankr. D. Col. 2006) ....................................................10

In re Page,
    118 B.R. 456, 459 (Bankr. N.D. Tex. 1990).................................................10

Redwood Trust v. Am. Budget Storage, LLC (In re Am. Bldg. Storage),
    285 Fed. Appx. 375 (9th Cir. 2008)..............................................................8

In re TCR of Denver, LLC,
    338 B.R. 494 (Bankr. D. Col. 2006) .............................................................10

In re Turboff,
    120 B.R. 849, 850 (Bankr. S.D. Tex. 1990) .................................................11

United States v. Alaska National Bank (In re Walsh Constr., Inc.),
    669 F.2d 1325, 1328 (9th Cir. 1982) ............................................................8

**STATUTES**

11 U.S.C. § 102..........................................................................................................10

11 U.S.C. § 1109........................................................................................................10

11 U.S.C. § 1112....................................................................................................10, 14

**RULES**

Fed. R. Bank. P. 1017 ...............................................................................................10

Fed. R. Bankr. P. 9019..........................................................................................8, 13

# I.

## STATEMENT OF FACTS

### A.    The Debtor's Business.

The Debtor was a newly formed company that was established during 2007 to own and operate the Hotel and Weller Court in the "Little Tokyo" area of Downtown Los Angeles.  The Hotel is located at 120 South Los Angeles Street, and Weller Court is located at 227 East Second Street.

### B.    Debtor's Secured Debt.

Pursuant to that certain Business Loan Agreement dated as of August 10, 2007 (the "Original Loan"), First Regional Bank ("FRB") loaned to the Debtor the original principal sum of $44,000,000.  The Original Loan was secured by a deed of trust on both the Hotel and Weller Court, which were part of a single legal lot at the time.  The Original Loan was partially guaranteed (the "Guaranty") by the Debtor's equity owners (the "Guarantors").  In December 2008, FRB formally released all obligations under each of the Guaranties.  As discussed further below, there is a dispute among the Parties as to the liability, if any, of the Guarantors under the Guaranties.  First-Citizen Bank & Trust Company (the "Bank"), the successor to FRB, challenges the validity of FRB's release of the Guaranties.

In August 2009, the Debtor divided the Hotel and Weller Court into two legal lots—one for the Hotel and one for Weller Court—and refinanced its loan obligation to FRB.  In November 2009, the Debtor entered into a new loan transaction with FRB under which the Debtor borrowed $33,600,000 and granted FRB a first priority deed of trust on the Hotel to secure the new loan (the "Bank's Hotel Note").  The proceeds of the Bank's Hotel Note were paid to FRB in partial satisfaction of the Original Loan, and FRB released the deed of trust on the Hotel which secured the Original Loan.  The remaining balance owing on the Original Loan in the amount of $10,400,000 is, therefore, now secured only by Weller Court.  This reduced loan shall be referred to herein as the "Bank's Weller Note."  The two loans are not cross-collateralized but they do contain cross-default provisions.  The Bank's Hotel Note has never been guaranteed.

On January 29, 2010, FRB was closed by the California Department of Institutions, and the Federal Deposit Insurance Corporation (the "FDIC") was appointed receiver. The Bank acquired a majority of the assets of FRB, including the Bank's Hotel Note and Bank's Weller Note.

On July 13, 2010, Excell Investment Group, LLC ("Excell") funded a $300,000 loan to the Debtor, pursuant to a secured loan transaction, in order to fund the chapter 11 retainer payable to the Debtor's insolvency counsel. The balance owing to Excell as of March 4, 2011 was $307,234.

**C.    The ADA Litigation.**

On March 1, 2010, two individuals filed a lawsuit in the United States District Court for the Central District of California in Los Angeles styled *Hugh Marsh and Neva Lema, Plaintiffs v. Grand Kyoto Hotel; Little Tokyo Partners, L.P.; Little Tokyo Partners, LLC; Crestline Hotels And Resorts, Inc.; and DOES 1 THROUGH 50, Inclusive, Defendants*, U.S.D.C. C.D. Cal. Case No. CV 10-1511 PA (AGRx) (the "ADA Litigation"). Mr. Marsh and Ms. Lema ("Plaintiffs") alleged that (a) the Plaintiffs were disabled, (b) the defendants own, operate or lease the Hotel and (c) the Hotel does not comply with the Americans with Disabilities Act ("ADA") and its supporting regulations and standards and analogous California laws, regulations and standards. The Debtor and the other defendants in the ADA Action ("Defendants") disputed many of the Plaintiffs' allegations. On the basis of the Management Agreement between Crestline and the Debtor, the Debtor was obligated to defend Crestline in the ADA Litigation and indemnify it against all losses. The ADA Litigation has been stayed as a result of the filing of the Debtor seeking bankruptcy protection. Based on the claims docket in this case, it appears that the ADA plaintiffs and their counsel may have sold their claims.

**D.    Events Leading Up To Chapter 11 Filing.**

Starting in the last quarter of 2008, the Debtor's financial performance was materially impacted by the continuing deterioration in the overall economy and the resulting decline in the business and leisure travel market. The Hotel experienced a precipitous drop in revenue starting in the last quarter of 2008, which continued throughout 2009. As a result, the Debtor defaulted under

1    the Bank's Hotel Note in January 2010.  The Debtor, however, remained current on the Bank's

2    Weller Note through the Petition Date.

3            The Bank commenced non-judicial foreclosure proceedings against both the Hotel

4    and Weller Court, relying on the cross-default provisions.  The Bank also filed a complaint (the

5    "State Court Complaint") seeking, among other things, (1) judicial foreclosure, (2) the appointment

6    of a receiver for both the Hotel and Weller Court, and (3) resurrection of the Guaranties.[1]  The

7    Debtor commenced the above-captioned case (the "Chapter 11 Case") on July 15, 2010.

8    **E.    Events During the Chapter 11 Case.**

9            The Chapter 11 Case has been pending for less than eight months.  Two months after

10    seeking bankruptcy protection, the Debtor filed its initial plan of reorganization, which sought to

11    restructure the Bank's Hotel Note and reinstate the Bank's Weller Note.  Subsequently, the Debtor

12    filed its "Notice of Voluntary Waiver of the Debtor's Exclusivity Periods" [Docket No. 103] on

13    September 8, 2010.  The Bank thereafter sought to force a sale of both the Hotel and Weller Court,

14    through a section 363(b) sale to be undertaken by either the Debtor or the Official Committee of

15    Unsecured Creditors (the "Committee").  The Court rejected the Bank's efforts.

16            The Debtor proposed a new plan of reorganization that sought to unimpair all claims

17    asserted against the Debtor's estate.  Shortly thereafter, the Bank filed a competing plan, which

18    sought to implement an auction process to sell the Hotel and Weller Court in a joint sale.  After the

19    Debtor had filed all of its evidence in support of its unimpairment plan and the Bank had engaged all

20    of its experts to file controverting evidence, the Debtor and the Bank commenced mediation of their

21    disputes before the Honorable Judge John Ryan, retired.  The Debtor and the Bank met for a full day

22    of mediation and continued their settlement discussions for several weeks.  The Settlement

23    Agreement, which is described in further detail below, is the product of these arms-length, good faith

24

25

26    _____

27    [1]    The State Court Complaint has been removed to this Court, commencing Adversary Proceeding
        No. 2:10-AP-02412-BR.  The Complaint seeks to (a) void the December 2008 releases of the
28    Guarantors, (b) "reform" the Guaranties, and (c) transform those Guaranties into guaranties of
        the Prepetition Bank Hotel Note (which was entered into only after the Guaranties had been
        formally released).

settlement discussions.  <u>See</u> Declaration of Joseph Daneshgar, which is annexed hereto(the "<u>Daneshgar Declaration</u>"), ¶¶ 11-14.

### 1.    Retention Of Professionals.

The Debtor obtained authority to employ Stutman, Treister & Glatt Professional Corporation ("<u>Stutman</u>") as its reorganization counsel.  The Debtor has also employed, pursuant to prior Court orders, the following professionals of the Debtor's estate:

- Troutman Sanders, LLP as litigation counsel to defend the Adversary Proceeding;
- Colliers PKF Consulting USA as a real estate consultant for the Debtor; and
- FTI Consulting, Inc. as a financial advisor for the Debtor.

In addition, the Official Committee of Unsecured Creditors (the "<u>Committee</u>") has employed, pursuant to an order of this Court, Arent Fox LLP, the Committee's counsel.[2]  Under the orders approving the retention of these professionals, the payment of their fees and expenses are subject to further review by the Court.  Because the Debtor seeks to pay these professionals, as well as all other undisputed claims, in full, as a condition to the dismissal of the Chapter 11 Case, the Debtor asks the Court to modify these procedures as set forth below.

The Debtor has requested invoices from all professionals.  As the Debtor proposes to pay all undisputed claims and administrative expenses in full as a condition to the dismissal of the Chapter 11 Case, as described in greater detail below, no party other than the Debtor will be impacted by the fees paid to professionals.  It would be an unnecessary drain on the resources of the Debtor's estate and this Court to require professionals to file fee applications and seek Court approval of their fees and expenses when all creditors, including professionals of the estate, are to be paid in full.  Moreover, the Debtor has every incentive to carefully review the fees paid.  In the event that the Debtor is unable to reach agreement with any professional regarding the payment of their invoices, the Debtor asks that this Court retain jurisdiction to consider the fee applications of that professional.

---

[2]    In addition, the Debtor also retained certain ordinary course professionals who have received regular payments in the ordinary course of the Debtor's business.

1     **2.**  **Statutory Fees.**

2     The Debtor is current in its payment of all applicable U.S. Trustee and Court fees.

3 The Debtor proposes, as a condition to dismissal, that all U.S. Trustee fees and Court fees be paid in

4 full.

5   **F.**  **The Debtor's Unsecured Claims and Other Claims.**

6     On July 29, 2010, the Debtor timely filed its Schedules of Assets and Liabilities, as

7 well as its Statements of Financial Affairs (together, the "Schedules").  Based on a prior motion of

8 the Debtor, the Bankruptcy Court established a bar date of December 10, 2010 (the "Bar Date") for

9 the filing of proofs of claim in the above-captioned Chapter 11 Case.  A notice of Bar Date (the

10 "Claims Bar Date Notice") was served on all creditors and parties in interest.  The Bar Date has now

11 passed.  By and large, the Debtor does not dispute the claims asserted against the Debtor's estate,

12 subject to a few limited exceptions.

13     First, there are a handful of claims that appear to be related to the ADA Litigation

14 (the "ADA Claims"), which are reflected on the Debtor's claims register as Claim Nos. 48 to 52.  As

15 explained above, the ADA Litigation was stayed as a result of the Debtor seeking bankruptcy

16 protection.  After dismissal, parties would be restored to their pre-petition positions.  Creditors

17 holding the ADA Claims will be able to pursue all of their non-bankruptcy remedies against the

18 Debtor. These are the same rights and remedies that they would be able to pursue if the Debtor had

19 never filed for bankruptcy protection, or if the Bank's competing plan were confirmed.  Dismissal of

20 the Chapter 11 Case does not in any way prejudice the rights of the ADA claimants.

21     Other than the ADA Claims, the Debtor proposes to pay most remaining claims, in

22 full, immediately upon entry of the dismissal order.  These claims and the amounts to be paid by the

23 Debtor are set forth on Exhibit "1" ("Goddard Exhibit '1'") attached to the Declaration of David

24 Goddard filed concurrently herewith (the "Goddard Declaration").  As reflected on Goddard Exhibit

25 "1", a number of claims have already been satisfied in full, in accordance with the "Order Granting

26 Emergency Motion For Order Permitting Debtor To Honor Pre-Petition Customer Deposits and

27 Travel Agency Commissions" [Docket No. 54] and require no further payment.

28     In preparing Goddard Exhibit "1," the Debtor discovered that there were a handful of

547961v7              5

1    claims that had been incorrectly scheduled in an amount greater than what is currently due (the

2    "Disputed Claims"). See Goddard Declaration, ¶18. These Disputed Claims and the amounts that

3    the Debtor proposes to pay on account of the Disputed Claims are reflected on Exhibit "2" attached

4    to the Goddard Declaration. The Debtor commits to paying the full amount owed to all creditors. In

5    the event that any creditor disputes the amounts due, the Debtor will attempt resolve any such

6    dispute in the ordinary course of business and anticipates that it will be able to work out consensual

7    resolutions with creditors holding Disputed Claims, but should the parties not reach agreement, the

8    Debtor requests that the Court retain jurisdiction to hear any disputes in connection with the

9    Disputed Claims.

10         Finally, the Debtor proposes paying all other claims asserted against the Debtor's

11   estate in the ordinary course of business. For example, the Los Angeles County Treasurer and Tax

12   Collector has filed two claims – one claim asserting amounts due for estimated taxes (Claim No. 60)

13   and the other for amounts due for property taxes (Claim No. 61). The Debtor is current in the

14   payment of all of its taxes and will continue to make tax payments in the ordinary course of its

15   business.

16         **G.    Settlement Agreement.**

17         The Settlement Agreement resolves all claims and issues between the Debtor and the

18   Bank. In general terms, the Settlement Agreement provides for the restructuring of the Bank's Hotel

19   Note and Bank's Weller Note, which will be partially guaranteed by the Guarantors. A true and

20   correct copy of the Settlement Agreement and operative documents is attached as Exhibit "1" to the

21   Daneshgar Declaration. The main terms of the Settlement Agreement are described below[3]:

22         (a)    Payments. Borrower and/or Principals will pay or caused to be paid to Lender
     the following amounts: (i) $5,000,000.00 principal pay down on the Hotel Loan; (ii) payment of the

23   Post-December Accrued Interest Amounts for both Loans; (iii) payment of $200,000.00 for the
     Seville Breakup Fee; and (iv) payment in full of the Hawaii Land Loan**.**

24

25         (b)    Modification of Loans. The Loans will be modified to provide as follows:

26   _____

27   [3]    The summary of the Settlement Agreement is for reference purposes only. To the extent that any
         section of the Motion conflicts with, contradicts or is inconsistent with any provision of the
28       Settlement Agreement, the terms and provisions of the Settlement Agreement shall govern.
         Terms used in this section herein shall have the same meanings ascribed to them in the
         Settlement Agreement.

(i)    New maturity date of December 31, 2014;

(ii)    interest only payments at the existing floating contract rate of interest (i.e., the Wall Street Journal Prime Rate which is referred to as the Index Rate in the Notes) with maximum of 1% increase in any 12 month period;

(iii)    payments of interest only in arrears during term of the Loan, with payments due as of the first day of each month (with the first payment being the first day of the first full month after the Effective Date);

(iv)    each of the existing Hotel Loan Note and Weller Court Loan Note will be considered an "A Note" with new "B Notes" consisting of the Hotel Loan B Note (as herein defined) and the Weller Court Loan B Note (as herein defined) being created on the following terms: (1) the principal amount of each such "B Note" shall be equal to the Pre-December Accrued Interest Amount for each Loan, as applicable, (2) no periodic payments shall be due under the "B Notes", but interest shall accrue on the principal thereunder at the Index Rate, (3) all sums outstanding under the "B Notes" shall be due and payable to Lender on the earlier of the occurrence of an Event of Default or December 31, 2014, unless Borrower pays and performs its obligations under the corresponding "A Note", in which case the applicable "B Note" will be cancelled without payment, (3) the B Note will be secured by the existing deed of trust for the corresponding Loan; and

(v)    Principals will execute new guaranties with respect to each Loan as follows: (1) guaranty of the interest payments during term of the Loan, (2) non-recourse carve out guaranty in the event of a bankruptcy filed or participated in by Borrower or Principals, with the amount of such guaranties capped at $5,000,000.00 for the Hotel Loan and $2,000,000.00 for the Weller Court Loan respectively and (3) repayment of the B Note if and when it becomes due.

(c)    Parking SNDA.  Borrower and Lender will execute an SNDA with respect to the currently existing parking easement which burdens Weller Court and benefits the Hotel in order to, in the event of subsequent event of default under the Hotel Loan and Lender's exercise of its remedies, Lender (or any transferee of Lender) would only be required to pay a reduced monthly parking charge of $150 per space.

(d)    Waivers and Releases.  The Payment Default and the Alleged Defaults will be deemed waived and otherwise cured, the Accrued Default Amounts and all of the Other Accrued Loan Amounts will be deemed waived, and each of the Parties will provide, and correspondingly receive, full releases with respect to all pending disputes between the parties.

(e)    Bankruptcy; Actions.  The Parties will stay all pending proceedings and will promptly seek (and obtain as a condition precedent to the Effective Date), final Court approval of the settlement, dismissal of the Adversary Proceeding with prejudice (including, without limitation, the Borrower Related Claims) and dismissal of the Bankruptcy.  Lender will dismiss the State Court Action with prejudice to the extent not previously dismissed or vacated.

Releases – The Settlement Agreement provides for the mutual release of claims among all Parties, except for the liabilities outlined above.

1       <u>Effective Date</u> – The Settlement Agreement will become effective upon, among other

2 things, the funding of an escrow account and the entry of a final, non-appealable order approving the

3 Settlement Agreement and the dismissal of the Chapter 11 Case.  In the event that the Court does not

4 approve the dismissal of the Chapter 11 Case, the Settlement Agreement shall become effective

5 upon the entry of a final, non-appealable order confirming a plan of reorganization that incorporates

6 the Settlement Agreement.

7 **II.**

8 **ARGUMENT**

9   **A.**    **This Court Should Approve the Settlement Agreement Pursuant to**
        **Bankruptcy Rule 9019 As It is Fair, Reasonable, and in the Best Interests**

10         **of all Creditors.**

11       Bankruptcy Rule 9019 provides, in relevant part:

12           (a)     On motion by the trustee notice and a hearing, the court may
approve a compromise or settlement.  Notice shall be given to

13                  creditors, the United States trustee, the debtor, and indenture
trustees as provided in Rule 2002 and to any other entity as the

14                  court may direct.

15           (c)     On stipulation of the parties to any controversy affecting the
estate the court may authorize the matter to be submitted to

16                  final and binding arbitration.

17 Fed. R. Bankr. P. 9019.

18       The Court of Appeals for the Ninth Circuit has long recognized that the bankruptcy

19 court has great latitude in approving compromise agreements.  <u>Martin v. Kane (In re A & C</u>

20 <u>Properties)</u>, 784 F.2d 1377 (9th Cir. 1986).  "The purpose of a compromise agreement is to allow the

21 [debtor in possession] and the creditors to avoid the expenses and burdens associated with litigating

22 sharply contested and dubious claims."  <u>Id</u>. at 1380-81.  Accordingly, in approving a settlement

23 agreement, the Court need not conduct an exhaustive investigation of the claims sought to be

24 compromised.  <u>See</u> <u>United States v. Alaska National Bank (In re Walsh Constr., Inc.)</u>, 669 F.2d

25 1325, 1328 (9th Cir. 1982).  Rather, it is sufficient that the Court find that the settlement was

26 negotiated in good faith and is reasonable, fair, and equitable.  <u>See</u> <u>In re A & C Properties</u>, <u>supra</u>,

27 784 F.2d at 1381; <u>see also</u> <u>Redwood Trust v. Am. Budget Storage, LLC (In re Am. Bldg. Storage)</u>,

28 285 Fed. Appx. 375 (9th Cir. 2008).

1    Consideration of a settlement does not require the Court to determine whether a

2 settlement presented is the best one that could possibly have been achieved.  Rather, the Court need

3 only canvass the issues to determine whether the settlement falls "below the <u>lowest point in the zone</u>

4 <u>of reasonableness</u>."  <u>Newman v. Stein</u>, 464 F.2d 689, 698 (2d Cir. 1972) (emphasis added), <u>cert.</u>

5 <u>denied sub nom. Benson v. Newman</u>, 409 U.S. 1039 (1972); <u>see also</u> <u>Anaconda-Ericsson Inc. v.</u>

6 <u>Hessen (In re Teltronics Services, Inc.)</u>, 762 F.2d 185, 189 (2d Cir. 1985); <u>Cosoff v. Rodman (In re</u>

7 <u>W.T. Grant Co.)</u>, 699 F.2d 599, 608 (2d Cir. 1983), <u>cert. denied</u> 464 U.S. 822 (1983).  Finally,

8 although the Court should give deference to the reasonable views of creditors, "objections do not

9 rule.  It is well established that compromises are favored in bankruptcy." <u>In re Lee Way Holding</u>

10 <u>Co.</u>, 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990).  Moreover, because all undisputed claims will be

11 paid in full in cash contemporaneously with dismissal, creditors will benefit from the Settlement

12 Agreement and have no economic interest in future payments to the Bank.

13    As set forth in the Daneshgar Declaration, the Settlement Agreement is fair,

14 reasonable, and in the best interests of the Debtor's creditors.  The Settlement Agreement provides

15 the pathway for the consensual resolution of this Chapter 11 Case.  Instead of litigating over two

16 competing plans and a host of other issues related to the Debtor's pre-petition debt, the Debtor and

17 the Bank have come to terms on the restructuring of the Bank's Hotel Note and Bank's Weller

18 Note.  This paves the way for the Debtor to emerge from this Chapter 11 Case in an efficient and

19 cost-effective manner without draining estate resources to fund the cost of litigation.  With the

20 restructuring of this debt, the Debtor can pay all of its creditors in full and continue with its

21 business operations without interruption.  The Settlement Agreement is the product of good faith

22 and arms-length negotiations between counsel for the Debtor and the respective representatives of

23 the Bank and the Guarantors and took into account the various claims and defenses raised by the

24 Parties.

25    Accordingly, the Debtor believes that the terms of the Settlement Agreement are

26 fair and reasonable and should be approved by the Court.

27

28

**B.    A Chapter 11 Case May Be Dismissed Voluntarily By A Debtor Under 11 U.S.C. § 1112(b) Unless Dismissal Would Cause Some "Plain Legal Prejudice" To Creditors.**

Bankruptcy Code section 1112(b) allows the Court, upon request of a party in interest, to dismiss a chapter 11 case for "cause."  11 U.S.C. § 1112(b).[4]  Although section 1112(b) enumerates various grounds for dismissal, the section's use of the term "includes" is not limiting.  See 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting").  Accordingly, courts have held that "cause" for purposes of section 1112(b) may include any reasonable grounds justifying dismissal, whether or not expressly stated in the Code.  See In re Gonic Realty Trust, 909 F.2d 624, 626 (1st Cir. 1990).

A debtor's motion to dismiss its own chapter 11 case should be granted, "in all but extraordinary situations."  In re Geller, 74 B.R. 685, 689 (Bankr. E.D. Pa. 1987).  Indeed, courts have routinely granted debtors' motions to dismiss chapter 11 cases where proceeding under chapter 11 no longer benefits the debtor or creditors.  See, e.g., In re Hospitality Assocs. of Tappan Zee Ltd. P'ship, 102 B.R. 369, 372 (Bankr. S.D.N.Y. 1989) (where the debtor's primary secured creditor did not object to dismissal, the court held, "[w]hen there is no useful purpose in retaining jurisdiction over a chapter 11 case because the debtor does not wish to continue under the aegis of chapter 11…, it follows that voluntary dismissal should be permitted pursuant to 11 U.S.C. § 1112(b)"); see also In re Evans, No. 01-21259, 2002 Bankr. LEXIS 1932 (Bankr. D. Idaho 2002) (granting debtor's motion to dismiss chapter 11 case where debtor lacked a reasonable likelihood of rehabilitation and secured claims threatened to "consume the estate"); In re Mountain Highlands, LLC, No. 11-06-10011, 2008 Bankr. LEXIS 3336 (Bankr. D. N.M. 2008) (granting debtor's motion to dismiss); In re TCR of Denver, LLC, 338 B.R. 494 (Bankr. D. Col. 2006) (same); In re OptinRealBig.com, LLC, 345 B.R. 277, 283 (Bankr. D. Col. 2006) (dismissing chapter 11 case and holding that, "[r]eorganization is a process that is costly and time consuming for the parties and for the Court. Where … reorganizing under the protection of the Bankruptcy Court no longer serves the interests of

---

[4]    Pursuant to Bankruptcy Code section 1109, a party in interest includes the Debtor.  11 U.S.C. § 1109.  See, e.g., In re Int'l Airport Inn P'ship., 517 F.2d 510 (9th Cir. 1975) (a debtor has the right to seek dismissal of its case); In re Page, 118 B.R. 456, 459 (Bankr. N.D. Tex. 1990) ("the debtor, as a party in interest, may request dismissal . . . under §1112(b)"); see also Fed. R. Bank. P. 1017 (establishing procedures to dismiss case at debtor's request).

a debtor or its creditors, then the Court believes that cause exists for dismissal ...."); In re Midland Marina, Inc., 259 B.R. 683 (8th Cir. B.A.P. 2001) (affirming bankruptcy court's dismissal of case upon debtor's motion)).

Courts generally grant requests for voluntary dismissal unless to do so would result in some "plain legal prejudice" to creditors.  See, e.g., Gill v. Hall (In re Hall), 15 B.R. 913, 917 (Bankr. 9th Cir. 1981) (following In re Int'l Airport Inn P'ship., 517 F.2d 510 (9th Cir. 1975) (decided under the Bankruptcy Act)); In re Kimble, 96 B.R. 305, 307-08 (Bankr. D. Mont. 1988); In re Turboff, 120 B.R. 849, 850 (Bankr. S.D. Tex. 1990).  As one court has stated, "a debtor wishing dismissal of a case should obtain this result in all but extraordinary situations."  In re Geller, 74 B.R. 685, 689 (Bankr. E.D. Pa. 1987).

Cause exists to dismiss the Debtor's Chapter 11 Case.  The Chapter 11 Case was initiated primarily to restructure the Bank's secured claims and prevent foreclosure.  The Settlement Agreement restructures the Bank's secured claims, and the effectiveness of this settlement is dependent on the dismissal of the Chapter 11 Case.  The dismissal of the Chapter 11 Case will ensure the preservation of the Debtor's going concern value.  The Debtor will no longer be burdened by the myriad costs and expenses of operating its business in a bankruptcy proceeding, including the costs of litigation if the Settlement Agreement is not approved.

Because the Debtor has requested that dismissal of the Chapter 11 Case be conditioned on the payment in full of all undisputed claims against the Debtor's estate, including: (i) all U.S. Trustee fees, (ii) all undisputed fees and expenses incurred by professionals of the Debtor's estate, (iii) the Excell loan, and (iv) all undisputed claims as set forth in Goddard Exhibit "1," no creditor will not suffer any "legal prejudice" from the dismissal of the Chapter 11 Case. Indeed, all creditors holding undisputed claims will be paid in full sooner than they would be paid through the plan process.  With respect to the Disputed Claims, the Debtor is proposing to pay these creditors the amounts due as set forth in Goddard Exhibit "2" and, in the event, a dispute arises between the parties, requests that the Court retain jurisdiction to hear any such disputes so as not to prejudice the rights of these creditors.

1    Although the ADA Claims will not be paid in full in cash prior upon dismissal of the

2    Chapter 11 Case, the Debtor is not proposing to prejudice the holders of these claims in any way

3    through the dismissal of this Chapter 11 Case.  Creditors holding the Disputed ADA Claims will be

4    able to pursue all of their non-bankruptcy remedies against the Debtor.  These are the same rights

5    and remedies that they would be able to pursue if the Debtor had never filed for bankruptcy

6    protection, or if the Bank's competing plan were confirmed.  As such, no creditor is prejudiced by

7    the dismissal of the Chapter 11 Case, and it is in the best interests of all creditors for this Chapter 11

8    Case to be dismissed.

9    While the Debtor will no longer need the protections of chapter 11 once the

10    Settlement Agreement is implemented and the claims asserted against the Debtor will be resolved as

11    described above, the Debtor requests that the Court retain jurisdiction with respect to the following

12    very limited matters:  (i) setting hearings and entering orders on final fee applications to be

13    submitted by professionals of the Debtor's estate in the event that a dispute arises between the

14    Debtor and any professional regarding the payment of their fees and expenses; (ii) deciding matters

15    related to Disputed Claims if a dispute arises in connection therewith; (iii) overseeing any

16    administrative matter that may arise in connection with implementing the dismissal; and

17    (iv) entering such ministerial orders as necessary to implement the dismissal.  By retaining this

18    limited scope of jurisdiction, the Court will ensure that the dismissal of the Chapter 11 Case will

19    proceed smoothly without prejudice to the Debtor's creditors.

20

21

22

23

24

25

26

27

28

# III.

## CONCLUSION

**WHEREFORE,** the Debtor requests the entry of an order (1) approving, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Settlement Agreement, (2) authorizing and approving, pursuant to Bankruptcy Code section 1112(b) and Bankruptcy Rule 1017, the Debtor's voluntary dismissal of the Chapter 11 Case, (3) ruling that the Court retains jurisdiction with respect to the following limited matters:  (a) setting hearings and entering orders on final fee applications to be submitted by professionals employed by the Debtor or the Official Committee of Unsecured Creditors if a dispute arises between the Debtor and any professional regarding the payment of fees and expenses; (b) deciding matters related to Disputed Claims if a dispute arises in connection therewith;  (c) overseeing any administrative matter that may arise in connection with implementing the dismissal; and (d) entering such ministerial orders as necessary to implement the dismissal; (4) dismissing the Adversary Proceeding, with prejudice and (5) granting such other and further relief as this Court deems just and proper under the circumstances.

Dated:  March 15, 2011                        Respectfully submitted,


                                              */s/ Christine M. Pajak*
                                              JEFFREY C. KRAUSE, and
                                              CHRISTINE M. PAJAK, Members of
                                              STUTMAN, TREISTER & GLATT
                                              PROFESSIONAL CORPORATION

### DECLARATION OF JOSEPH DANESHGAR

I, Joseph Daneshgar, declare as follows:

1.     I am over 18 years old.  I have personal knowledge of the statements set forth below except for those facts stated on information and belief, and as to those facts, I am informed and believe them to be true.  If called upon to do so, I could and would testify competently to the matters stated in this Declaration because I know them of my own personal knowledge.

2.     I am a partner of 3D Investments IV, L.P., the Debtor's Limited Partner.

3.     The Debtor commenced the above-captioned case by filing a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on July 15, 2010 (the "Petition Date").

4.     As a partner of the Debtor's Limited Partner, I am intimately familiar with strategic and financial planning, financing, and business operations of the Debtor.  I am involved with all major decisions made by the Debtor.  Accordingly, I have personal knowledge of all major aspects of the Debtor's ongoing business affairs.  Based upon my personal knowledge of the Debtor and its business operations, I am qualified to give this Declaration.

5.     I submit this Declaration in support of confirmation of the "Motion For Order (1) Approving Settlement With First-Citizens Bank & Trust Company, (2) Dismissing The Chapter 11 Case Pursuant To Bankruptcy Code Section 1112(b), and (3) Dismissing the Adversary Proceeding with Prejudice" and the Memorandum of Points and Authorities in support thereof (the "Brief").[5]  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, operating reports prepared by the employees of Crestline Hotels & Resorts, Inc. ("Crestline") and Everest IV, LLC, which companies operate and manage the Hotel and Weller Court respectively, discussions I have had with these employees or my opinion based upon my experience, expertise and knowledge of the Debtor's operations, financial condition and the industry.  If I were called upon to testify, I could and would testify competently as to my knowledge regarding the veracity of the facts set forth herein.

---

[5]     Terms not otherwise defined herein shall have the same meanings ascribed to them in the Brief.

A.      **The Debtor's Operations.**

6.      The Debtor was a newly formed company that was established during 2007 to own and operate the Hotel and Weller Court in the "Little Tokyo" area of Downtown Los Angeles. The Hotel is located at 120 South Los Angeles Street, and Weller Court is located at 227 East Second Street.

B.      **Events Leading Up To Chapter 11 Filing.**

7.      I have read the Brief and the descriptions contained therein of the Debtor's pre-petition relationship with Bank, and they are, to the best of my knowledge and belief, an accurate description of the relationship and the events that took place prior the Chapter 11 Case.

8.      Starting in the last quarter of 2008, the Debtor's financial performance was materially impacted by the continuing deterioration in the overall economy and the resulting decline in the business and leisure travel market.  The Hotel experienced a precipitous drop in revenue starting in the last quarter of 2008, which continued throughout 2009.  As a result, the Debtor defaulted under the Bank's Hotel Note in January 2010.  The Debtor, however, remained current on the Bank's Weller Note through the Petition Date.

9.      The Bank commenced non-judicial foreclosure proceedings against both the Hotel and Weller Court, relying on the cross-default provisions.  The Bank also filed a complaint (the "State Court Complaint") seeking, among other things, (1) judicial foreclosure, (2) the appointment of a receiver for both the Hotel and Weller Court, and (3) resurrection of the Guaranties.[6]  The Debtor commenced the Chapter 11 Case on July 15, 2010.

C.      **Events During the Chapter 11 Case.**

10.      The Chapter 11 Case has been pending for less than eight months.  Two months after seeking bankruptcy protection, the Debtor filed its initial plan of reorganization, which sought to restructure the Bank's Hotel Note and reinstate the Bank's Weller Note.  Subsequently, the Debtor filed its "Notice of Voluntary Waiver of the Debtor's Exclusivity Periods" [Docket No. 103]

---

[6]      The State Court Complaint has been removed to this Court, commencing Adversary Proceeding No. 2:10-AP-02412-BR.  The Complaint seeks to (a) void the December 2008 releases of the Guarantors, (b) "reform" the Guaranties, and (c) transform those Guaranties into guaranties of the Prepetition Bank Hotel Note (which was entered into only after the Guaranties had been formally released).

1   on September 8, 2010.  The Bank thereafter sought to force a sale of both the Hotel and Weller

2   Court, through a section 363(b) sale to be undertaken by either the Debtor or the Official Committee

3   of Unsecured Creditors (the "Committee").  The Court rejected the Bank's efforts.

4           11.     The Debtor proposed a new plan of reorganization that sought to unimpair all

5   claims asserted against the Debtor's estate.  Shortly thereafter, the Bank filed a competing plan,

6   which sought to implement an auction process to sell the Hotel and Weller Court in a joint sale.

7   After the Debtor had filed all of its evidence in support of its unimpairment plan and the Bank had

8   engaged all of its experts to file controverting evidence, the Debtor and the Bank commenced

9   mediation of their disputes before the Honorable Judge John Ryan, retired.

10          **D.      Negotiations and the Settlement Agreement.**

11          12.     I, personally, participated in the mediation and was active in the negotiations

12  with the Bank.  Discussions with the Bank took place over the course of several weeks.

13  Negotiations were principally handled by counsel for the parties, and I, personally, met with

14  representatives of the Bank on more than one occasion to facilitate discussions between the parties.

15  This lengthy process resulted in the parties reaching agreement, which has been documented in the

16  Settlement Agreement.  An executed copy of the Settlement Agreement is attached hereto as Exhibit

17  "1".  The operative documents to the Settlement Agreement, which are substantially in final form,

18  are attached as exhibits thereto.  Upon completion, the Debtor will file updated exhibits with the

19  Court in advance of the hearing on the Motion.

20          13.     The Settlement Agreement proposes a settlement of all issues among the

21  parties related to the Chapter 11 Case and the Adversary Proceeding.  The Settlement Agreement is

22  the product of good faith, arms-length negotiations between the parties and took into account the

23  various claims and defenses available to the parties.

24          14.     I believe that the terms of the proposed Settlement Agreement are fair,

25  reasonable, and in the best interests of the Debtor's creditors.  The Settlement Agreement provides

26  the pathway for the consensual resolution of this Chapter 11 Case.  Instead of litigating over two

27  competing plans and a host of other issues related to the Debtor's pre-petition debt, the Debtor and

28  the Bank have come to terms on the restructuring of the Bank's Hotel Note and Bank's Weller Note.

I believe that this paves the way for the Debtor to emerge from this Chapter 11 Case in an efficient and cost-effective manner without draining estate resources to fund the cost of litigation.  With the restructuring of this debt, the Debtor can pay all of its creditors in full and continue with its business operations without interruption.

**E.    The ADA Litigation.**

15.    On March 1, 2010, two individuals filed a lawsuit in the United States District Court for the Central District of California in Los Angeles styled *Hugh Marsh and Neva Lema, Plaintiffs v. Grand Kyoto Hotel; Little Tokyo Partners, L.P.; Little Tokyo Partners, LLC; Crestline Hotels And Resorts, Inc.; and DOES 1 THROUGH 50, Inclusive, Defendants*, U.S.D.C. C.D. Cal. Case No. CV 10-1511 PA (AGRx) (the "ADA Litigation").  Mr. Marsh and Ms. Lema ("Plaintiffs") alleged that (a) the Plaintiffs were disabled, (b) the defendants own, operate or lease the Hotel and (c) the Hotel does not comply with the Americans with Disabilities Act ("ADA") and its supporting regulations and standards and analogous California laws, regulations and standards.  The Debtor and the other defendants in the ADA Action ("Defendants") disputed many of the Plaintiffs' allegations. On the basis of the Management Agreement between Crestline and the Debtor, the Debtor was obligated to defend Crestline in the ADA Litigation and indemnify it against all losses.  The ADA Litigation has been stayed as a result of the filing of the Chapter 11 Case by the Debtor.

16.    Upon information and belief, I believe that there are a handful of claims that appear to be related to the ADA Litigation (the "ADA Claims"), which are reflected on the Debtor's claims register as Claim Nos. 48 to 52.  The Debtor does not seek to resolve either the ADA Litigation or the ADA Claims through this Chapter 11 Case.

17.    After dismissal of the Chapter 11 Case, parties would be restored to their pre-petition positions.  Creditors holding the ADA Claims will be able to pursue all of their non-bankruptcy remedies against the Debtor. These are the same rights and remedies that they would be able to pursue if the Debtor had never filed for bankruptcy protection, or if the Bank's competing plan were confirmed.  I believe that dismissal of the Chapter 11 Case does not in any way prejudice the rights of the ADA claimants.

1         I declare under penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct.

3         Executed this _14_ day of March, 2011, at Los Angeles, California.

4

5

6                          JOSEPH DANESHGAR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28